******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JACOB DOE *v*. HARTFORD ROMAN CATHOLIC
DIOCESAN CORPORATION
(SC 19131)
(SC 19132)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald and Robinson, Js.

*Argued September 22, 2014—officially released July 7, 2015*

*John W. Sitarz* and *Wesley W. Horton*, with whom was *Lorinda S. Coon*, for the appellant (defendant).

*Hugh D. Hughes*, with whom were *Thomas McNamara* and, on the brief, *William F. Gallagher*, for the appellee (plaintiff).

*Brenden P. Leydon* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

ROBINSON, J. A jury found that the defendant, the Hartford Roman Catholic Diocesan Corporation, acted negligently and recklessly when it assigned Father Ivan Ferguson, an alcoholic whose admitted acts of child molestation were understood to be linked to his drinking, to serve as the director of Saint Mary's Elementary School in Derby (Saint Mary's School), where he sexually abused the plaintiff, Jacob Doe,[1] from 1981 through 1983. The defendant now appeals from the judgment of the trial court, rendered in accordance with the jury's verdict, which awarded the plaintiff $1 million in damages plus punitive damages in the form of attorney's fees and costs.[2] On appeal, the defendant raises a plethora of claims challenging the judgment of the trial court, including that: (1) there was insufficient evidence to support the jury's verdict that the defendant had acted negligently and recklessly from 1979 through 1983; (2) the trial court made numerous improper evidentiary rulings, particularly when it precluded expert testimony that would have provided a historical perspective about the public's perception of pedophilia[3] from 1979 through 1983; (3) the trial court improperly struck the special defense of laches; and (4) the retroactive application of certain amendments to the applicable statute of limitations, General Statutes § 52-577d,[4] which had the effect of reviving the plaintiff's otherwise time barred claims, violated the defendant's substantive due process rights under article first, §§ 8 and 10, of the Connecticut constitution.[5] We disagree with all of these claims. Accordingly, we affirm the judgment of the trial court.

The record reveals the following facts, which the jury reasonably could have found, and procedural history. In the early morning of March 7, 1979, Father Gene Gianelli, a priest who was serving as secretary to Archbishop John Whealon, received a telephone call from Ferguson, who at that time was a priest at Saint Bernard's Parish in Tariffville and a teacher at Northwest Catholic High School in West Hartford (Northwest). Ferguson informed Gianelli that a woman had reported to Father Joseph Donahue, another priest at Saint Bernard's Parish, that Ferguson had molested two boys in the parish, and that the accusation was in fact true. Ferguson also told Gianelli that he was experiencing an alcohol problem, and asked for help.

Later that day, Whealon met with Donahue and Ferguson in Whealon's office; Gianelli did not attend that meeting. Whealon, however, memorialized that meeting in a handwritten memorandum to Gianelli, stating that Ferguson had been struggling with his sexuality since childhood, and "[n]ow alcohol has entered the picture." Whealon noted specifically that Ferguson had molested the two boys "in a way that showed his abject weakness," but was now "totally contrite," acknowledging

he needed help, and had claimed that he was not in "immediate danger of touching others . . . ." Whealon communicated the decisions made during the meeting, namely, that: (1) they would arrange for Ferguson to be treated at the House of Affirmation, an inpatient facility; (2) Donahue would inform the woman who had reported the molestation about their solution and "will ask them to tell no one"; and (3) Ferguson would "tell no one" of what happened. Whealon noted his "hope [that Ferguson] can get help [and] control it permanently. Otherwise we have a real problem."[6]

Subsequently, on March 16, 1979, Donahue reported to Gianelli that Ferguson had not gone to the House of Affirmation, and did not want to leave Saint Bernard's Parish. Gianelli brought this to Whealon's attention. After following up on this report, Whealon stated in a memorandum that there "is more at [Northwest] than we know of," and that the mother of one of the boys who had been molested was seeing a counselor with him. Whealon observed further that the counselor was a mandated reporter under state law, and the "entire matter seems to be blowing up" as the "mother is not satisfied that anything is being done." With respect to additional victims, Whealon noted specifically that "there were [four] older boys, last summer. These last [two] were in [November] 1978. Seemingly nothing has happened at [Northwest]." Whealon directed Gianelli to call Ferguson and tell him to leave Saint Bernard's Parish, or else Whealon "who [is] liable," would order him out personally.

Subsequently, Gianelli discussed Ferguson's alcoholism and acts of child molestation with Father Michael Peterson, a priest and physician who was the director of the Saint Luke Institute in Holliston, Massachusetts. Gianelli then reported to Whealon that he had arranged for Ferguson to enter the inpatient program at the Saint Luke Institute on March 26, 1979, which would first "work with [his] chemical dependence" and then his "emotional and psychological problems" over a four to six month period. Gianelli did not know whether or how the Saint Luke Institute specifically would address Ferguson's pedophilia. Gianelli further advised Whealon that he would inform Northwest, through the defendant's superintendent of schools, that Ferguson would be leaving the teaching assignment to "get 'some help' " because of "some pressures [Ferguson] is experiencing," in order to "keep this thing quiet and help [Ferguson]" who "agrees with this procedure. It can and will save him from [an] embarrassing situation." Gianelli noted that it "will be recommended that [Ferguson's] next assignment be away from the area he is presently assigned to." Gianelli then stated that he would direct Donahue to "inform the [woman] in Tariffville that [Ferguson] is away and being treated. I will not let this woman know where [Ferguson] is receiving treatment. She could become a pest if she knew."

Ferguson was treated as an inpatient at the Saint Luke Institute from March 26 through July 12, 1979. Whealon visited Ferguson at the Saint Luke Institute, and, after consultation with Peterson, arranged for Ferguson to be reintegrated into the ministry by assigning him to serve, upon his discharge, as the chaplain of Lauralton Hall, an all girls school, and to reside in a nearby rectory. Whealon summarized the details of the transition plan in a handwritten memorandum to Gianelli dated June 17, 1979, stating "it is OK to say that [Ferguson] is an alcoholic and is now completing his rehabilitation in a new alcoholism program." Whealon then directed Gianelli to arrange for: (1) Ferguson to reside in a "nearby rectory which has an open dialoguing, priestly spirit"; (2) Peterson to brief the rectory priests and school administrators about Ferguson's treatment for alcoholism; and (3) Father Leonard Kvedas, a local priest, to help Ferguson join a clergy oriented Alcoholics Anonymous group.[7] Peterson's briefing was held on July 22, 1979. Ferguson's sexual proclivities were not discussed at that meeting. On July 27, 1979, Whealon formally appointed Ferguson to serve part-time as chaplain at Lauralton Hall; in November, 1979, Ferguson began to serve part-time as assistant pastor of Saint Mary's Parish in Derby, where he resided in the rectory.

On June 8, 1981, Ferguson was assigned to serve full-time as assistant pastor of Saint Mary's Parish. Ferguson later requested a new teaching assignment, which Peterson had supported as clinically appropriate with respect to Ferguson's "other issues . . . as long as the disease of alcoholism is in control."[8] Father Richard Bollea, the pastor of Saint Mary's Parish, then appointed Ferguson to serve as director of Saint Mary's School, rather than grant Ferguson's initial request to work at an all boys school. Gianelli testified that he did not know, however, whether Whealon had ever warned Bollea about Ferguson's pedophilia, and Gianelli had not done so personally. Gianelli also did not know of any restrictions placed on Ferguson's ability to be around minors following his release from the Saint Luke Institute. Donna Dougherty, the plaintiff's eighth grade teacher at Saint Mary's School, testified that she had never been advised that Ferguson had been treated for the sexual abuse of young boys, or to keep an eye on him around students.[9]

The plaintiff and his best friend, R, attended Saint Mary's School while Ferguson was the priest-director there.[10] Ferguson had befriended R by taking him "under . . . his wing" after the death of his mother, and met the plaintiff, then a thirteen year old seventh grader, through R. At the time, both the plaintiff and R considered Ferguson's friendship to be a privilege because he was younger and more "hip" than the "stuffy" older priests; Ferguson was interested in the music that the

students liked, and he let them call him by his first name. Ferguson often pulled the boys from their classes for errands or to help him as altar servers at daily masses, and would then take them for a soda or a snack before they returned to class. The plaintiff described Ferguson as "the man" at Saint Mary's School, and stated that, "if he liked you, you were held in high esteem . . . ."

Ferguson then began to molest the plaintiff and R both on and off the grounds of Saint Mary's School. Ferguson would step in for the female gym teacher to supervise the male students in the communal shower after physical education classes, where he would soap the boys' backs and make comments about their genitals. Other molestations took place in the basement of Saint Mary's School, where the plaintiff would be summoned from class to help Ferguson retrieve supplies.

Ferguson's relationship with the plaintiff and R deepened as they entered eighth grade, and he often took them to restaurants and for sleepovers at the rectory.[11] Other students were frequently present during the sleepovers. Bollea, the pastor of the parish who also lived in the rectory, was downstairs in the building during these sleepovers; on one occasion he greeted R in the rectory's kitchen when R went to get breakfast after a sleepover.[12] Frequent molestations occurred during these sleepovers.[13] Eventually, these events culminated in an episode during which Ferguson sodomized the plaintiff in the basement of Saint Mary's School. The plaintiff and R did not tell anyone about the molestations because, despite their feelings of shame, they enjoyed the social popularity that resulted from Ferguson's attention to them.

As they moved into high school, the plaintiff and R never discussed their molestations or told anyone else about them; as adults, they initially agreed not to say anything about them. The plaintiff kept the molestations a secret for more than twenty years[14] and moved on to marry,[15] have two sons, and work as a fire marshal and investigator. Thereafter, Thomas McNamara, the attorney who represented the plaintiff at trial in this case, contacted him as a potential witness in connection with a separate lawsuit that R had brought against the defendant. At that point, after receiving counseling to address anxiety and despair caused by the molestations and his secret becoming public, the plaintiff brought this action against the defendant.

In his two count complaint, the plaintiff claimed that the defendant's actions with respect to its assignment and supervision of Ferguson were negligent and reckless,[16] and caused him serious and debilitating emotional injuries, and sought money damages, punitive damages, exemplary damages, and attorney's fees and costs. In response, the defendant filed an answer and

pleaded numerous special defenses, including laches and the statute of limitations.

The trial court granted the plaintiff's motion to strike the special defense of laches. The defendant later filed a motion for summary judgment on the ground that the action was time barred under § 52-577d, and that, under the due process clauses of the federal and state constitutions, the "cause of action cannot be revived by retroactive application of a lengthened limitation period enacted after the time allowed for bringing claims had already expired." The trial court disagreed with these claims and denied the defendant's motion for summary judgment.

The case was tried to a jury, which returned a verdict finding that the plaintiff had proven by a preponderance of the evidence that the defendant's conduct was a proximate cause of the plaintiff's injuries insofar as it had negligently and recklessly failed to: (1) supervise Ferguson adequately in "his interaction and conduct toward minors with whom he would have contact"; (2) "immediately remove . . . Ferguson from any position within the [defendant] when it knew or had reason to know that he was a danger to minors"; and (3) "warn or advise its congregations, parishioners and employees, which would have included the plaintiff's mother and father, of the threat which . . . Ferguson posed to minor children, including the plaintiff." The jury awarded the plaintiff $1 million in compensatory damages, and the trial court awarded punitive damages in the form of attorney's fees and costs on the recklessness count. The trial court subsequently denied the defendant's motion to set aside the verdict.[17] This appeal followed. See footnote 2 of this opinion.

On appeal, the defendant challenges numerous aspects of the trial court proceedings, contending that: (1) the evidence was insufficient to support the jury's negligence and recklessness verdicts; (2) the trial court made several improper evidentiary rulings; (3) the trial court improperly struck the defendant's special defense of laches; and (4) the revival of the plaintiff's time barred cause of action through the retroactive application of § 52-577d violated the defendant's substantive due process rights under the Connecticut constitution. We address each claim in turn, and set forth additional relevant facts and procedural history where necessary.

I

SUFFICIENCY OF THE EVIDENCE CLAIMS

We begin with the defendant's claims challenging the sufficiency of the evidence in this case, specifically that: (1) expert testimony was necessary to support the plaintiff's claims by establishing what was commonly known about pedophilia during the late 1970s and early 1980s; (2) the jury could not reasonably have found that the defendant had failed to supervise Ferguson

adequately; and (3) the jury's recklessness finding lacks support because there was no evidence that Whealon had consciously disregarded a known danger.

"A party challenging the validity of the jury's verdict on grounds that there was insufficient evidence to support such a result carries a difficult burden. In reviewing the soundness of a jury's verdict, we construe the evidence in the light most favorable to sustaining the verdict. . . . Furthermore, it is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine . . . whether the totality of the evidence, including reasonable inferences therefrom, supports the jury's verdict . . . . [I]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Citation omitted; internal quotation marks omitted.) *Broadnax* v. *New Haven*, 294 Conn. 280, 299, 984 A.2d 658 (2009).

Moreover, with respect to the trial court's refusal to set aside the verdict, "we accord great deference to the vantage of the trial judge, who possesses a unique opportunity to evaluate the credibility of witnesses. . . . The concurrence of the judgments of the [trial] judge and the jury . . . is a powerful argument for upholding the verdict." (Citation omitted; internal quotation marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 534, 733 A.2d 197 (1999).

"Two further fundamental points bear emphasis. First, the plaintiff in a civil matter is not required to prove his case beyond a reasonable doubt; a mere preponderance of the evidence is sufficient. Second, the well established standards compelling great deference to the historical function of the jury find their roots in the constitutional right to a trial by jury." (Footnote omitted.) Id., 534–35.

A

Whether Expert Testimony Was Necessary

The defendant first claims that, because of the age of the allegations in the present case relative to the time of trial, expert testimony was necessary to support the jury's finding of negligence. The defendant relies heavily on this court's decision in *LePage* v. *Horne*, 262 Conn. 116, 809 A.2d 505 (2002), and argues in its brief that expert testimony was necessary to establish the lay standard of care because of the complex nature of the subject matter of pedophilia "*combined with* the thirty-year gap between the conduct and the judging of it," insofar as "[s]ociety's understandings about child sexual abuse have changed significantly over time."[18] (Emphasis in original.) The defendant contends that expert testimony about the "prevailing understanding about the nature of pedophilia and prospects for treatment thirty years before" was necessary, and posits that the plaintiff had urged the jury to view the evidence

in this case, in particular the report from the Saint Luke Institute indicating Ferguson's desire to teach at an all boys school, "through the distorting lens of hindsight."

In response, the plaintiff contends that the trial court properly determined that expert testimony was not necessary because this was not a professional malpractice case centered on curing pedophilia, but rather, concerned the defendant's failure to apply a "minimal level of care" insofar as Ferguson "should have been in jail, not director of Saint Mary's School. If the defendant had shown a minimal level of concern for the obviously foreseeable future victims of a six time child molester and called the police, none of this would have happened." The plaintiff further argues that "[e]xpert testimony has never been required in Connecticut to prove a negligent supervision claim where there has been past intentional conduct of the same kind perpetrated in the pending case," observing that the "gravity of the harm alone, child rape, indicates that the defendant's plan for secrecy was a violation of its duty to supervise and inform parents and teachers of Ferguson's history and obvious propensity to molest minor boys."[19] On the facts of this case, given the defendant's actual knowledge that Ferguson had molested multiple children, along with that destructive behavior being closely linked to his alcoholism and risk of relapse, we agree with the plaintiff and conclude that expert testimony was not required to establish the lay standard of care.

"As an initial matter, we note that the [trial] court's determination of whether expert testimony was needed to support the plaintiff's claim of negligence against the defendant was a legal determination, and, thus, our review is plenary." *Vanliner Ins. Co.* v. *Fay*, 98 Conn. App. 125, 136–37, 907 A.2d 1220 (2006); accord *LePage* v. *Horne*, supra, 262 Conn. 125–26; *Santopietro* v. *New Haven*, 239 Conn. 207, 226, 682 A.2d 106 (1996).

"We begin by setting forth the relevant parameters under our negligence jurisprudence. The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury. . . . Contained within the first element, duty, there are two distinct considerations. . . . First, it is necessary to determine the existence of a duty, and [second], if one is found, it is necessary to evaluate the scope of that duty. . . . The issue of whether a duty exists is a question of law . . . which is subject to plenary review. We sometimes refer to the scope of that duty as the requisite standard of care. . . .

"[O]ur threshold inquiry has always been whether the specific harm alleged by the plaintiff was foreseeable to the defendant. . . . By that is not meant that one charged with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position,

knowing what he knew or should have known, antici-pate that harm of the general nature of that suffered was likely to result? . . . The idea of risk in this context necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reason-able belief that harm may possibly follow. . . . Accord-ingly, the fact finder must consider whether the defendant knew, or should have known, that the situa-tion at hand would obviously and naturally, even though not necessarily, expose [the plaintiff] to probable injury unless preventive measures were taken." (Citations omitted; internal quotation marks omitted.) *LePage* v. *Horne*, supra, 262 Conn. 123–24.

"[E]xpert testimony . . . serves to assist lay people, such as members of the jury and the presiding judge, to understand the applicable standard of care and to evaluate the defendant's actions in light of that stan-dard. . . . Expert testimony is required when the ques-tion involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." (Cita-tion omitted; emphasis omitted; internal quotation marks omitted.) Id., 125. Typical cases where expert testimony is required are those that "are akin to allega-tions of professional negligence or malpractice." *Santo-pietro* v. *New Haven*, supra, 239 Conn. 226.

Guided by the content of the parties' summations, we agree with the plaintiff's characterization of the central question submitted to the jury in the present case, namely, whether it was reasonable for the defen-dant to rely on Peterson's opinion that Ferguson's con-tinued sobriety was the key to maintaining the behavioral inhibitions that would keep him from molest-ing more boys. See footnote 8 of this opinion and accom-panying text. The plaintiff correctly observes that the jury was not required to determine as a scientific matter whether pedophilia was at some point in history ever considered curable, or whether Ferguson was treated properly by Peterson and the clinical staff at the Saint Luke Institute. Rather, the issue for the jury boiled down to whether, given the gravity of the harms caused by child molestation, it was reasonable to take a chance on Ferguson's continued success in his alcoholism treatment. Accordingly, the question we must answer in this appeal is whether the possibility that an alcoholic might relapse is a subject within the ordinary juror's common knowledge and experience.[20]

We conclude that the risk that a person under treat-ment for addiction to alcohol could relapse into that addiction is not, and historically has not been, a subject outside the common knowledge and experience of an ordinary juror. "Jurors are not expected to lay aside matters of common knowledge or their own observa-tion and experience of the affairs of life, but, on the contrary, to apply them to the evidence or facts in hand, to the end that their action may be intelligent and their

conclusions correct." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 157, 869 A.2d 192 (2005). To this end, it has long been established that "sobriety and intoxication are matters of common knowledge"; *State* v. *Adams*, 2 Conn. Cir. Ct. 481, 484, 202 A.2d 262 (1964); meaning that expert testimony is not required to explain their effects. *State* v. *Folson*, 10 Conn. App. 643, 653, 525 A.2d 126 (1987); accord *State* v. *Padua*, supra, 157 (expert testimony not necessary to sustain risk of injury conviction because "the effects of orally ingesting marijuana are within the common knowledge of the average juror"); *State* v. *Clark*, 260 Conn. 813, 824, 801 A.2d 718 (2002) ("We recognize that, because it is an illegal substance, it may be that many jurors may have no firsthand knowledge regarding the effects of marijuana on one's ability to perceive and to relate events. At the same time, we cannot blink at the reality that, despite its illegality, because of its widespread use, many people know of the potential effects of marijuana, either through personal experience or through the experience of family members or friends. The ability to draw inferences about the impairing effects of marijuana, like alcohol, however, is based upon common knowledge, experience and common sense, not necessarily on personal experience."); see also, e.g., *State* v. *Means*, 115 Ariz. 502, 504, 566 P.2d 303 (1977); *People* v. *Paro*, 283 App. Div. 2d 669, 670, 724 N.Y.S.2d 531, appeal denied, 96 N.Y.2d 922, 758 N.E.2d 666, 732 N.Y.S.2d 640 (2001); *State* v. *Smissaert*, 41 Wn. App. 813, 815, 706 P.2d 647, review denied, 104 Wn. 2d 1026 (1985).

Akin to the effects of alcohol, it has been held to be "a matter of common knowledge that addicts often relapse, going back and forth between substance abuse and sobriety."[21] *Jones* v. *Valdez*, United States District Court, Docket No. 1:09CV00132 (MHW) (D. Idaho March 23, 2012), aff'd sub nom. *Jones* v. *Ellis*, 586 Fed. Appx. 344 (9th Cir. 2014); accord *Zenor* v. *El Paso Healthcare Systems, Ltd.*, 176 F.3d 847, 858 (5th Cir. 1999) (The defendant hospital was "entitled to consider the relapse rate for cocaine addiction in determining that [the plaintiff] was not qualified to work as a pharmacist. . . . As noted, cocaine addiction has a very high relapse rate, and the risk of harm from a potential relapse was great." [Citation omitted.]); *D'Amico* v. *New York*, 132 F.3d 145, 151 (2d Cir. 1998) ("[the firefighter's] history of cocaine addiction, together with the [fire department's] judgment as to the possibility of, and the risks inherent in, a relapse, justified the [fire department's] decision to terminate [the firefighter's] employment").

Contrary to the defendant's claims, this case is not analogous to the more subtle intersection of common knowledge and medicine presented to the jury in *LePage*, which required us to consider whether an ordinary person would be aware, given then recent advances in research, that the risk of sudden infant

death syndrome is not merely present, but "appreciably greater" when an infant is left sleeping in a prone position. *LePage* v. *Horne*, supra, 262 Conn. 126. Rather, the present case presented the jury with the far simpler question of whether it was reasonable for the defendant to put Ferguson—who was known to the defendant as a child molester whose pedophilic tendencies were exacerbated by alcohol—back in a position where he was in contact with minors and, thus, roll the proverbial dice about whether Ferguson would ever drink alcohol and revert to his dangerous sexual proclivities.[22] It was not about the scientific aspects of pedophilia, but rather, the evaluation of a risk well within the ken of the average juror, namely, alcoholism and its attendant risk of relapse. Cf. *Bader* v. *United Orthodox Synagogue*, 148 Conn. 449, 454, 172 A.2d 192 (1961) ("[e]xpert testimony was not required to support the claim of the plaintiff that the absence of a proper or suitable porch railing was a structural defect and therefore constituted corporate negligence"). Accordingly, we conclude that the plaintiff was not required to provide expert testimony in order to sustain his case.

B

Negligent Supervision

The defendant next claims that there was insufficient evidence that it did not adequately supervise Ferguson because there was no evidence of how the defendant's personnel supervised him, insofar as the witnesses to the relevant facts are either dead or very elderly. Relying heavily on this court's decision in *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, 250 Conn. 14, 734 A.2d 85 (1999), the defendant contends that the jury's finding of negligent supervision was, therefore, based on improper speculation and conjecture. The plaintiff contends otherwise, citing evidence of the secretive nature of the defendant's conduct vis-á-vis Ferguson and drawing an inference, from Bollea's inaction during the sleepovers in the rectory and Dougherty's testimony that Whealon and his aides had not advised anyone at Saint Mary's School to take precautions given Ferguson's history of child molestation. We agree with the plaintiff, and conclude that the jury's verdict of negligent supervision was supported by sufficient evidence.[23]

Specifically, we disagree with the defendant's claim that the jury's conclusion that the defendant had not provided adequate supervision of Ferguson, a priest that it knew had molested children, was founded solely on the kind of sympathy driven "creative guesswork" that led this court to overturn a jury's verdict of negligence in *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 250 Conn. 30. Proof of the defendant's failure to supervise was readily accomplished by reasonable inference from the evidence admitted at trial. In particular, we agree with the plaintiff that the jury's verdict of negligent supervision is supported by R's

testimony that Bollea had not questioned his presence in the rectory with Ferguson, and by the testimony of Dougherty that she was never advised by her superiors of Ferguson's proclivities, or told to safeguard her students in any way. The inferences to be drawn from this direct testimony are buttressed by evidence of Whealon's numerous directives urging discretion and silence with respect to Ferguson's acts.[24]

To the extent the defendant urges us to conclude otherwise through its reliance on the monitoring of Ferguson's sobriety, and occasional reports from the Saint Luke Institute to Whealon, it is asking us to sit as the "seventh juror" and retry the facts on appeal, which contravenes our long-standing reluctance "to disturb jury verdicts, and we accord great deference to the vantage of the trial judge, who possesses a unique opportunity to evaluate the credibility of witnesses." *Gaudio* v. *Griffin Health Services Corp.*, supra, 249 Conn. 534. Accordingly, we decline to disturb the jury's verdict finding that the defendant had negligently supervised Ferguson.

### C

### Recklessness

The defendant next claims that there was no evidence from which the jury properly could have found that Whealon had consciously disregarded a known danger, thus, meaning that its recklessness finding is not supported by sufficient evidence. The defendant argues that the evidence in this case, specifically, Whealon's memorialized hope that Ferguson " 'can get help and control it permanently' " or " '[o]therwise we have a real problem,' " "showed . . . the opposite of conscious disregard," namely, Whealon's "desire and intent to do the right thing both for the people of the Archdiocese [of Hartford] and for . . . Ferguson." The defendant contends that its decision to send Ferguson for inpatient treatment and evaluation at the Saint Luke Institute, and to impose a slow, carefully monitored return to service, demonstrates that it proceeded cautiously in light of Whealon's then reasonable "understanding that Ferguson's condition needed to be and could be permanently controlled." (Emphasis omitted.)

In response, the plaintiff contends that the defendant's recklessness is demonstrated by its "total lack of concern for the victims and their families," as evinced by Whealon's commitment to secrecy in furtherance of the "defendant's sole concern [being] to protect itself, its reputation, and its priests." Noting Whealon's knowledge of six prior molestations by Ferguson, the plaintiff emphasizes that, "[e]ven if [Whealon] believed, in defiance of common sense which existed in 1981 as it does today, that alcoholism was the cause of sexual molestation, it remained reckless to toss the wolf into the sheep pen *and not warn a soul*." (Emphasis in original.) We

agree with the plaintiff, and conclude that the jury reasonably could have found that the defendant's actions rose to the level of recklessness.

"Recklessness requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent. . . . More recently, we have described recklessness as a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action." (Citations omitted; internal quotation marks omitted.) *Matthiessen* v. *Vanech*, 266 Conn. 822, 832–33, 836 A.2d 394 (2003); see also *Dubay* v. *Irish*, 207 Conn. 518, 533, 542 A.2d 711 (1988) ("The result is that [wilful], wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. . . . It is at least clear . . . that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention . . . ." [Internal quotation marks omitted.]).

We agree with the plaintiff that, given the vulnerability of the children attending the defendant's churches and schools, the jury reasonably could have viewed Whealon's commitment to secrecy with respect to Ferguson's treatment and reassignment as indicative of the defendant's recklessness. This was particularly so given that Whealon held in great confidence the fact that Ferguson had molested six other boys before being sent for alcohol treatment. Whealon's consciousness of the risk is further demonstrated by his statement that Ferguson needed to "get help and control it permanently. Otherwise we have a real problem." Accordingly, we view the defendant's arguments to the contrary, including its emphasis on Whealon's "reasonable, good faith reliance on the professional advice" of Peterson, as nothing more than attempts to retry this case.[25] See, e.g., *Gaudio* v. *Griffin Health Services Corp.*, supra, 249 Conn. 534–35.

## II

## CHALLENGES TO EVIDENTIARY RULINGS

We next address the defendant's challenges to several of the trial court's evidentiary rulings, specifically those: (1) precluding the expert testimony of John Philip Jenkins, a social historian; and (2) relating to Ferguson's treatment at the Saint Luke Institute, including the admission of Ferguson's 1997 deposition testimony and the preclusion of Gianelli's testimony about Peterson's statements to him.

A

Jenkins' Expert Testimony

The defendant claims that the trial court improperly precluded the expert testimony from Jenkins, who would have testified that: (1) in the 1970s, child molestation was commonly believed to be incidental to causes such as alcoholism or senility, rather than an independently compulsive or persistent behavior; and (2) the defendant's response to what it learned about Ferguson was consistent with the practices considered appropriate in that period. The defendant argues that Jenkins' testimony would have provided the jury with a helpful "temporal context that would have reduced the problem of hindsight reasoning," given that this case concerned the lay standard of reasonable care from 1979 through 1983, rather than 2012 when this case was tried. In response, the plaintiff contends that the trial court did not abuse its discretion in excluding Jenkins' testimony because it was irrelevant to the issues in the case, and, further, as a historian and not a mental health professional, Jenkins was not qualified to testify about mental health practices in the 1970s. We agree with the plaintiff, and conclude that the trial court did not abuse its discretion by precluding Jenkins' expert testimony.

We note that the record reveals the following relevant facts and procedural history. The defendant disclosed that it intended to call Jenkins, who at the time of trial was a distinguished professor of history at Baylor University and professor emeritus at Pennsylvania State University, to testify as an expert witness about "the historical context of the issue of sexual abuse at the time that the offenses allegedly occurred in this case," including with regard to the Roman Catholic Church. Consistent with the defendant's expert disclosure under Practice Book § 13-4, Jenkins testified during voir dire that his extensive scholarship concerns the history of social problems such as crime, including child molestation, and his studies attempt to document changing attitudes about these issues during different periods in history, by surveying opinion polls, newspaper articles and opinion pieces, and scholarly journal articles. Jenkins has written a book about a "cultural intellectual revolution" with respect to child sexual abuse that took place "suddenly" during the 1980s regarding the proper way to respond to incidents of the sexual abuse of minors, in both religious and secular organizations. He

testified that one of the "sharpest differences" between the 1970s and today was the perceived harmfulness of abuse to children and young people, along with a belief that such abuse was far less common than is perceived today. Jenkins further noted that, at that time, the vast majority of religious and secular institutions lacked formal policies for addressing instances of child sexual abuse. Jenkins also testified that there was an "extraordinarily limited" amount of literature on the crime of child sexual abuse available to nonexpert audiences prior to the 1980s, consistent with the view that it was not considered to be a "widespread threat."

Jenkins then testified that, in responding to incidents of sexual abuse, the consensus recommendation of the pre-1980s professional literature, consisting of psychiatric, psychological, and criminological journals and texts, was that "harm chiefly results from what is seen as a heavy-handed medical or official response," with many recommending against outreach to victims or offering them counseling. He stated that attitudes in the 1970s were "radically different to those prevailing today," insofar as the common perception was that the "offender was much less likely to be a compulsive individual and was much more likely to be a . . . casual or incidental offender who committed perhaps one act in particular circumstances, but in such a way that did not necessarily mark him as being . . . a lifelong or career or persistent offender." Jenkins also testified that, in the 1960s and 1970s, experts attributed sexually abusive behavior as secondary to personal immaturity, senility, or alcoholism, and the professional literature of the time "veer[ed] very strongly . . . towards therapy and treatment as opposed to punishment as a solution for molesters," and was "extremely optimistic about the potential of cure and prevention of reoccurrence, especially where the victim of the offense is a teenager as opposed to a prepubescent child." Jenkins found, however, that the changes in this field were occurring "rapidly and swiftly" by the mid-1980s.

The plaintiff filed a motion in limine to preclude, on relevance grounds, Jenkins' testimony "that public awareness of sexual abuse in society was not known to the public as it is now and that the defendant's conduct regarding . . . Ferguson should be viewed in light of the same." The trial court granted this motion and disagreed with the defendant's arguments in support of the admission of Jenkins' testimony, stating that although Jenkins "is an expert historian with an emphasis on church history," virtually none of his authored peer reviewed articles related to child sexual abuse and "less than [10] percent of his published books touch on anything that could possibly be related to his testimony in court today." The trial court also observed that the substance of Jenkins' proffered testimony that related to whether the defendant had or should have had notice

was rendered irrelevant because "notice is no longer an issue in this case," given the stipulations and the evidence. The trial court further concluded that Jenkins' testimony was inadmissible insofar as it related to the "reasonableness of [the defendant's] response" because it was "impermissible opinion evidence" given the lay standard of care applicable in this case. Thus, the trial court concluded that Jenkins' expert testimony would not be helpful to the jury.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . Even if a court has acted improperly in connection with the introduction of evidence, reversal of a judgment is not necessarily mandated because there must not only be an evidentiary [impropriety], there also must be harm. . . .

"This court recently articulated the test for the admission of expert testimony, which is deeply rooted in common law. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . .

"It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience must be directly applicable to the matter specifically in issue." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 157–59, 971 A.2d 676 (2009); see also Conn. Code Evid. § 7-2.[26]

We conclude that the trial court did not abuse its discretion in precluding Jenkins' testimony. Once the discrete factual issue of whether the defendant had, or should have had, notice of the fact that Ferguson was a child molester was eliminated by stipulation, the trial court reasonably determined that Jenkins' testimony became irrelevant and would have confused the jury

in determining whether the defendant's actions in response to that knowledge constituted negligence.[27] Further, with the propriety of the defendant's actions in this case being decided under a lay standard of care, the trial court properly determined that Jenkins' opinion approached impermissible ultimate issue testimony.[28] See, e.g., Conn. Code Evid. § 7-3 (a) ("[t]estimony in the form of an opinion is inadmissible if it embraces an ultimate issue to be decided by the trier of fact, except that . . . an expert witness may give an opinion that embraces an ultimate issue where the trier of fact needs expert assistance in deciding the issue"). Thus, we disagree with the defendant's claim that the trial court abused its discretion by precluding Jenkins' testimony.

## B

### Hearsay Issues

The defendant's next two evidentiary claims, namely, that the trial court improperly: (1) admitted the deposition testimony of Ferguson; and (2) sustained the plaintiff's objection to Gianelli's testimony about whether Peterson had informed him that Ferguson was treated for sexual problems at the Saint Luke Institute, implicate the residual exception to the hearsay rule.

By way of background, we note that "[o]ut-of-court statements offered to establish the truth of the matter asserted are hearsay. Such statements generally are inadmissible unless they fall within an exception to the hearsay rule. A hearsay statement that does not fall within one of the traditional exceptions to the hearsay rule nevertheless may be admissible under the residual exception to the hearsay rule provided that [1] the proponent's use of the statement is reasonably necessary and [2] the statement itself is supported by equivalent guarantees of trustworthiness and reliability that are essential to other evidence admitted under traditional exceptions to the hearsay rule." (Internal quotation marks omitted.) *In re Tayler F.*, 296 Conn. 524, 536, 995 A.2d 611 (2010); see also Conn. Code Evid. § 8-9.

"We previously have identified several factors that bear upon the trustworthiness and reliability of an out-of-court statement, including: (1) whether the circumstances are such that a sincere and accurate statement would naturally be uttered, and no plan of falsification [could] be formed . . . (2) the closeness of the relationship between the declarant and recipient . . . (3) whether the statement was made spontaneously and in confidence or obtained in response to government questioning conducted in anticipation of litigation . . . (4) the temporal proximity between the alleged statement and the events to which the statement refers . . . and (5) whether the declarant testifies at trial and is subject to cross-examination." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn.

633, 728–29, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006). We review the trial court's determinations regarding reasonable necessity and the statement's trustworthiness under the abuse of discretion standard. *In re Tayler F.*, supra, 296 Conn. 536.

1

Ferguson's Deposition Testimony

The defendant claims that the trial court improperly admitted the deposition testimony of Ferguson, which was taken in 1997 during the litigation of another case, in which Ferguson testified that he was treated only for alcohol abuse at the Saint Luke Institute, and nothing else. The defendant argues that the trial court improperly determined that the deposition testimony was "supported by equivalent guarantees of trustworthiness and reliability" because the factual issues in the 1997 case were distinct from those presented here, and it also was "riddled with self-serving omissions, half-truths, and falsehoods," along with Ferguson's repeated invocations of his privilege against self-incrimination under the fifth amendment to the United States constitution.[29] In response, the plaintiff contends that the trial court did not abuse its discretion because Ferguson's statement that he was treated only for alcohol abuse was "reliable" and "accords with every other admissible piece of documentary and testimonial evidence," including marketing materials from the Saint Luke Institute, letters from Peterson to Whealon, and the treatment plan that the Saint Luke Institute devised for Ferguson. The plaintiff also argues that this testimony is consistent with Peterson's theory that controlling Ferguson's alcoholism would control his pedophilia.[30] We agree with the plaintiff, and conclude that the trial court did not abuse its discretion by admitting Ferguson's 1997 deposition testimony into evidence under the residual exception.

The record reveals the following additional relevant facts and procedural history. The plaintiff offered a transcript of Ferguson's 1997 deposition testimony to prove that Ferguson was "never treated for sexual abuse; that he was only treated for alcohol . . . ." The defendant objected to the admission of the 1997 deposition as hearsay not subject to any exception. In response, the plaintiff contended that the deposition testimony was appropriately obtained and used under Practice Book § 13-3[31] because Ferguson was dead, it was relevant to rebut the defendant's claim that Ferguson had been treated for pedophilia, and that it was subject to the former testimony and residual exceptions to the hearsay rule. In particular, the plaintiff contended that the residual exception applied because there was "absolute necessity" and it was "trustworthy because it was under oath and it is consistent." The plaintiff emphasized the reliability of the deposition testimony

and the fact that not all questions of a sexual nature were met with an invocation of the fifth amendment privilege. Ultimately, the trial court admitted the 1997 deposition transcript as "clearly" within the residual hearsay exception.

Numerous portions of the 1997 deposition transcript were then read into evidence. That deposition testimony indicated that Ferguson had received treatment only for alcoholism at the Saint Luke Institute, and had not been treated for his sexual attraction to minors.[32] Ferguson then invoked his fifth amendment right against self-incrimination when questioned about his sexual attraction to minor males generally, and specifically about his relationship with an underage male, K.

The defendant does not dispute that Ferguson's death rendered the use of the hearsay statement reasonably necessary, and confines its arguments to whether the statement had the requisite guarantees of trustworthiness and reliability. We conclude that the trial court did not abuse its discretion in concluding that Ferguson's statements had equivalent guarantees of trustworthiness and reliability, notwithstanding the fact that the legal issues in the 1997 civil action were not congruent with those in the present case, insofar as that case concerned whether the defendant had notice of Ferguson's propensities during an earlier time period. First, the deposition was taken under oath, which is "a critical component of the trustworthiness and reliability calculus." *State* v. *Faison*, 112 Conn. App. 373, 384, 962 A.2d 860, cert. denied, 291 Conn. 903, 967 A.2d 507 (2009); see id. (Guarantees of trustworthiness and reliability did not exist when the declarant was friendly with the defendant and "did not make his statements under oath, a critical component of the trustworthiness and reliability calculus. . . . Second, [he] made his statements to a private investigator rather than law enforcement personnel. As such, [he] did not face the prospect of prosecution should his statements prove to be false." [Citation omitted.]); *State* v. *Henry*, 72 Conn. App. 640, 663, 805 A.2d 823 (written statement lacked sufficient reliability and trustworthiness when given to private investigator, rather than police officer, and was not under oath), cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002).

Second, as the plaintiff points out, Ferguson's testimony that he was not treated for any sexual disorders is consistent with the marketing materials provided by the Saint Luke Institute, which do not mention that the availability of such therapy, and the correspondence between Whealon and Peterson, which addresses Ferguson's alcohol treatment in detail, and is silent about the provision of treatment for any sexual disorder. This corroboration provides further support for the reliability of Ferguson's deposition testimony. See *State* v. *Mourning*, 104 Conn. App. 262, 280, 934 A.2d 263 (trial

court did not abuse its discretion by declining to admit statement that declarant's cellmate was shooter when police officers could not corroborate that version of events), cert. denied, 285 Conn. 903, 938 A.2d 594 (2007). Accordingly, we conclude that the trial court did not abuse its discretion by admitting Ferguson's deposition into evidence under the residual exception.

### 2

### Peterson's Statements to Gianelli

The defendant's final evidentiary claim is that the trial court improperly sustained the plaintiff's hearsay objection to Gianelli's testimony with respect to Peterson's statements to him about the nature of Ferguson's treatment at the Saint Luke Institute. The defendant contends that this testimony was admissible under the residual exception because it was necessary, given that Peterson is dead, and his statements were sufficiently trustworthy and reliable since they were made in the context of Ferguson's medical treatment. The defendant also contends that this statement was not hearsay because it was not admitted for the truth of the matter asserted, namely, that Ferguson had in fact been treated for his sexual problems, but rather, to support the defendant's reasonable belief that he had received such treatment. In response, the plaintiff contends that the trial court did not abuse its discretion in sustaining his objection, and further, that any error in the exclusion of this testimony was harmless. We agree with the plaintiff and conclude that, even if we assume without deciding that this testimony was not hearsay, its exclusion nevertheless was harmless error not requiring reversal.

The record reveals the following additional relevant facts and procedural history. While cross-examining Gianelli, the defendant informed the court of its desire to inquire about whether Peterson had informed him that Ferguson had been treated for sexual disorders at the Saint Luke Institute. The plaintiff objected on the ground that the proffered testimony was hearsay that "is offered . . . to prove that . . . Ferguson was indeed treated for sexual problems." The defendant argued that it was admissible under the residual exception to the hearsay rule and, alternatively, as nonhearsay "evidence of what . . . Gianelli was told. And whether . . . it was true or not true, it's still what he was told by . . . Peterson." The trial court then questioned Gianelli about whether, if "Peterson told you that . . . [Ferguson] received treatment for his sexual problems, as well as alcoholism while he was at [the Saint Luke Institute], did you share that information with anyone?" Gianelli responded that "I think I used a different term, but . . . I think it's in one of these memos. But I don't remember that. I wouldn't want to answer that either way." The plaintiff observed that Gianelli had said no when questioned similarly on direct, and Gianelli stated,

"I'm not sure what I said, to be—it's a vague thing for me." The trial court then sustained the plaintiff's objection without further elaboration.

Even if we assume, without deciding, that this testimony was not hearsay because it was not offered to prove the truth of the matter asserted, namely, that Ferguson had in fact been treated for his sexual disorder at the Saint Luke Institute; see, e.g., *State* v. *Saucier*, 283 Conn. 207, 223, 926 A.2d 633 (2007); this impropriety does not necessarily require reversal. "When a court commits an evidentiary impropriety, we will reverse the trial court's judgment only if we conclude that the trial court's improper ruling harmed the plaintiffs. . . . In a civil case, a party proves harm by showing that the improper evidentiary ruling likely affected the outcome of the proceeding." (Citation omitted.) *Weaver* v. *McKnight*, 313 Conn. 393, 417, 97 A.3d 920 (2014); see also, e.g., *Duncan* v. *Mill Management Co. of Greenwich*, 308 Conn. 1, 20–21, 60 A.3d 222 (2013) (factors for assessing harm from evidentiary error). The defendant has failed to establish that the exclusion of this hearsay testimony affected the verdict. The defendant does not point to any evidence that Gianelli communicated Peterson's claimed statement to his superiors, and Gianelli's own testimony is hazy on that point, as he testified that he did not remember what had been said. Thus, we conclude that any impropriety with respect to this evidentiary ruling is harmless error not requiring reversal.

## III

## LACHES

We next address the defendant's claim that the trial court improperly granted the plaintiff's motion to strike its special defense of laches.[33] The defendant contends that the Appellate Court's decision in *Giordano* v. *Giordano*, 39 Conn. App. 183, 215–16, 664 A.2d 1136 (1995), which held that laches was not an available defense when a plaintiff had brought a claim for damages for personal injuries arising from sexual abuse that was timely under § 52-577d, was improperly decided. Specifically, the defendant argues that *Giordano*, in holding that laches was not an available defense because the plaintiff's claims were legal, rather than equitable, in nature, improperly relies on an "archaic" distinction between law and equity that no longer exists as a practical matter. Instead, the defendant urges us to follow, inter alia, *Teamsters & Employers Welfare Trust of Illinois* v. *Gorman Bros. Ready Mix*, 283 F.3d 877, 880–81 (7th Cir. 2002), in support of its contention that laches can be applied to shorten the statute of limitations period in "appropriate cases," when it is "equitable" to do so because of a " 'culpable delay in suing' " that has caused the defendant to suffer harm. Although the plaintiff's brief fails to respond to this claim, we disagree with the defendant and conclude that the trial

court properly struck the defendant's laches special defense.

"Because a motion to strike challenges the legal sufficiency of a pleading and, consequently, requires no factual findings by the trial court, our review of the court's ruling on [a motion to strike] is plenary. . . . A party wanting to contest the legal sufficiency of a special defense may do so by filing a motion to strike. The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action. . . . In ruling on a motion to strike, the court must accept as true the facts alleged in the special defenses and construe them in the manner most favorable to sustaining their legal sufficiency." (Internal quotation marks omitted.) *TD Bank, N.A.* v. *M.J. Holdings, LLC*, 143 Conn. App. 322, 326, 71 A.3d 541 (2013); see also, e.g., *Mueller* v. *Tepler*, 312 Conn. 631, 646–47, 95 A.3d 1011 (2014).

"Laches consists of an inexcusable delay which prejudices the defendant. . . . We have said on other occasions that [t]he defense of laches does not apply unless there is an unreasonable, inexcusable, and prejudicial delay in bringing suit. . . . Delay alone is not sufficient to bar a right; the delay in bringing suit must be unduly prejudicial." (Citations omitted; internal quotation marks omitted.) *Cummings* v. *Tripp*, 204 Conn. 67, 88, 527 A.2d 230 (1987); see also, e.g., *State* v. *Lombardo Bros. Mason Contractors, Inc.*, 307 Conn. 412, 417 n.3, 54 A.3d 1005 (2012). The defense of laches has, however, only limited applicability. "Laches is purely an equitable doctrine, is largely governed by the circumstances, and is not to be imputed to one who has brought an action at law within the statutory period." (Internal quotation marks omitted.) *State* v. *Lombardo Bros. Mason Contractors, Inc.*, supra, 417 n.3, quoting *A. Sangivanni & Sons* v. *F. M. Floryan & Co.*, 158 Conn. 467, 474, 262 A.2d 159 (1969).

The Appellate Court's decision in *Giordano* v. *Giordano*, supra, 39 Conn. App. 183, is a paradigmatic example of the application of the principle that laches does not apply when a plaintiff has brought an action seeking legal relief within the statutory limitations period. In *Giordano*, the Appellate Court rejected the defendant's claim that § 52-577d "unfairly abrogates his right to assert the equitable defense of laches" because the plaintiffs' delay in bringing an action against him had "severely prejudiced" his ability to defend against the plaintiffs' allegations of childhood sexual abuse. Id., 212–13. Relying on *A. Sangivanni & Sons* v. *F. M. Floryan & Co.*, supra, 158 Conn. 474, the Appellate Court determined that the "defendant misunderstands the nature of a laches defense," holding that laches is "not . . . a substantive right that can be asserted in both legal and equitable proceedings," and only "is an

equitable defense allowed at the discretion of the trial court in cases brought in equity." (Emphasis omitted.) *Giordano* v. *Giordano*, supra, 214. Thus, the Appellate Court concluded that the "defendant's claim . . . that the legislature has abrogated his right to assert a defense of laches in this case, is simply incorrect. The plaintiffs' claim against the defendant sounds in tort, which is a legal, not equitable, action."[34] Id., 216.

Agreeing with the defendant's argument that *Giordano* was wrongly decided would require us to overrule the well established principle that laches "is purely an equitable doctrine, is largely governed by the circumstances, and is not to be imputed to one who has brought an action at law within the statutory period." *A. Sangivanni & Sons* v. *F. M. Floryan & Co.*, supra, 158 Conn. 474. This would require us to jettison a lengthy body of precedent[35] that is consistent with the "overwhelming majority" of jurisdictions that have considered this issue. See *Naccache* v. *Taylor*, 72 A.3d 149, 154 and n.9 (D.C. 2013) (collecting cases). Doing so, however, would not be supported by "the most cogent reasons and inescapable logic" that is required by the doctrine of stare decisis. *Perry* v. *Perry*, 312 Conn. 600, 615, 95 A.3d 500 (2014). As the District of Columbia Court of Appeals recently observed, "[e]ven if we were to come to this issue on a clean slate, we see little to gain and much to lose by applying the equitable defense of laches to cut off claims at law. . . . [S]uch claims are already governed by statutes of limitations that have been decided upon by the legislature. An express limitations period reflects a legislative value judgment striking the appropriate balance between the interests promoted by the statute and countervailing interests of repose. . . . The legislature determines the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones. . . . In some special cases, as here, the legislature has decided, based on fairness concerns, that a plaintiff may have an additional or indefinite amount of time to file suit. . . .

"To import laches as a defense to actions at law would pit the legislative value judgment embodied in a statute of limitations . . . against the equitable determinations of individual judges. Judges could disallow claims that the legislature had already determined were timely brought. Yet [m]odern statutes of limitations . . . embody the notion that fixing the periods for bringing damages actions is a legislative function. . . . Thus, to import laches as a defense to actions of law would alter the balance of power between legislatures and courts regarding the timeliness of claims." (Citations omitted; emphasis omitted; footnotes omitted; internal quotation marks omitted.) *Naccache* v. *Taylor*, supra, 72 A.3d 155–56, quoting *Ivani Contracting Corp.* v. *New York*, 103 F.3d 257, 260 (2d Cir. 1997). Thus, based on these "separation of powers and administra-

tive concerns . . . we conclude that the line between legal and equitable claims vis-á-vis laches is still sound, and we decline to disturb it. In cases at law, where the legislature has determined through a statute of limitations that the door for bringing suit should remain open for a predetermined period of time, it should not be left to a judge's discretion to close that door early."[36] *Naccache* v. *Taylor*, supra, 157. Accordingly, we conclude that the trial court properly granted the plaintiff's motion to strike the defendant's laches defense.

## IV

## STATE CONSTITUTIONAL CLAIM

Finally, we turn to the defendant's claim that the retroactive application of the extended sexual abuse statute of limitations, § 52-577d, to revive the plaintiff's time barred action violated its substantive due process rights under article first, §§ 8 and 10, of the Connecticut constitution because the defendant had a vested right to a defense under the lapsed statute of limitations.[37] Acknowledging that such revival is permissible under the due process clause of the fourteenth amendment to the United States constitution; see, e.g., *Chase Securities Corp.* v. *Donaldson*, 325 U.S. 304, 311–13, 65 S. Ct. 1137, 89 L. Ed. 1628 (1945); *Campbell* v. *Holt*, 115 U.S. 620, 629, 6 S. Ct. 209, 29 L. Ed. 483 (1885); the defendant furnishes a comprehensive analysis in accordance with *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and contends that the state constitution affords it greater protection against retroactive revival than does the federal constitution. In its *Geisler* analysis, the defendant points to, inter alia: (1) constitutional language in article first, § 10, guaranteeing "right and justice administered without . . . delay" as indicating that "undue delay in the administration of justice is unconstitutional"; (2) decisions from this court, starting with *Goshen* v. *Stonington*, 4 Conn. 209 (1822), suggesting that infringements on vested rights, such as a statute of limitations defense, are subject to heightened constitutional scrutiny; (3) numerous decisions from sister state courts rejecting the Supreme Court's decisions in *Chase Securities Corp.* and *Campbell* as a matter of state constitutional law; (4) the historical fact that statutes of limitations existed well before the state constitutional convention in 1818; and (5) economic and sociological considerations establishing that reviving an expired cause of action does "enormous . . . harm," by interfering with persons' and businesses' right to plan their affairs and complicating the defense of very old cases such as this one, wherein many of the witnesses and actors are dead or extremely elderly, and many of the relevant records have long since been destroyed subject to routine document retention policies.

In response, the plaintiff contends that there is no constitutional defect because under *Roberts* v. *Caton*,

224 Conn. 483, 619 A.2d 844 (1993), "no vested or substantive rights are at stake in revival of expired claims brought pursuant to . . . § 52-577d." The plaintiff then contends that, because § 52-577d does not implicate any fundamental rights, our review of that statute's constitutionality is limited to determining whether the legislature had a rational basis for enacting it, noting that the statute serves a legitimate purpose by "help[ing] minor victims of sexual abuse come to terms with what has happened to them," often many years later. The plaintiff then provides additional support for rational basis review, rather than heightened scrutiny, of § 52-577d by supplying his own *Geisler* analysis that relies primarily on *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, and *Campbell* v. *Holt*, supra, 115 U.S. 620, and sister state decisions following them in holding that the revival of a nonstatutory cause of action is not a due process violation. The plaintiff further emphasizes that the state court decisions that support the defendant are distinguishable because they are based on independent principles of state law, such as state constitutional provisions barring the enactment of retroactive legislation of any kind, which differ from those long followed in Connecticut. Finally, the plaintiff contends that, as a policy matter, he was equally disadvantaged by the loss of witnesses and documents occasioned by the passage of time. We agree with the plaintiff, and conclude that the application of § 52-577d retroactively to revive a time barred cause of action does not violate a defendant's substantive due process rights under the Connecticut constitution because it is a rational response by the legislature to the exceptional circumstances and potential for injustice faced by adults who fell victim to sexual abuse as a child.

Determining the "constitutionality of a statute presents a question of law over which our review is plenary. . . . It [also] is well established that a validly enacted statute carries with it a strong presumption of constitutionality, [and that] those who challenge its constitutionality must sustain the heavy burden of proving its unconstitutionality beyond a reasonable doubt. . . . The court will indulge in every presumption in favor of the statute's constitutionality . . . . Therefore, [w]hen a question of constitutionality is raised, courts must approach it with caution, examine it with care, and sustain the legislation unless its invalidity is clear." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 155, 957 A.2d 407 (2008).

In examining the constitutionality of § 52-577d under our state constitution, we recognize that, "[a]lthough earlier case law indicated that the due process provisions of both constitutions have the same meaning and the same limitations . . . more recent case law has suggested that our state constitution *may*, in certain instances, afford greater substantive due process rights

than the federal constitution. For example, in *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, [229 Conn. 312, 316, 640 A.2d 101 (1994)], a case involving a substantive due process challenge brought under the state constitution, we stated: It is beyond dispute that we are not bound by federal precedents in interpreting our own state constitutional provisions. [F]ederal decisional law is not a lid on the protections guaranteed under our state constitution." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Ramos* v. *Vernon*, 254 Conn. 799, 836–37, 761 A.2d 705 (2000).[38]

It is "axiomatic" that article first, § 10, of the Connecticut constitution "not only guarantees fair procedures in any governmental deprivation of life, liberty, or property, but also encompasses a substantive sphere . . . barring certain government actions regardless of the fairness of the procedures used to implement them . . . . This basic protection embodies the democratic principle that the good sense of mankind has at last settled down to this: that [due process was] intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice. . . .

"Despite the important role of substantive due process in securing our fundamental liberties, that guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm. . . . Rather, substantive due process has been held to protect against only the most arbitrary and conscience shocking governmental intrusions into the personal realm . . . ." (Internal quotation marks omitted.) Id., 835–36.

"[O]ur jurisprudence has identified a starting point for discovering fundamental rights guaranteed protection under our state constitution from arbitrary and conscience shocking governmental intrusions into the personal realm . . . ." (Internal quotation marks omitted.) Id., 838. "In determining the scope of our state constitution's due process clauses, we have taken as a point of departure those constitutional or quasi-constitutional rights that were recognized at common law in this state prior to 1818." (Internal quotation marks omitted.) Id.

"The analytical framework by which we determine whether, in any given instance, our state constitution affords broader protection to our citizens than the federal constitutional minimum is well settled. In *State* v. *Geisler*, [supra, 222 Conn. 684–86], we enumerated the following six factors to be considered in determining that issue: (1) persuasive relevant federal precedents; (2) the text of the operative constitutional provisions; (3) historical insights into the intent of our constitutional forebears; (4) related Connecticut precedents;

(5) persuasive precedents of other state courts; and (6) contemporary understandings of applicable economic and sociological norms, or as otherwise described, relevant public policies. . . .

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party—the state or the defendant—can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. . . . [N]ot every *Geisler* factor is relevant in all cases. . . . Moreover, a proper *Geisler* analysis does not require us simply to tally and follow the decisions favoring one party's state constitutional claim; a deeper review of those decisions' underpinnings is required because we follow only persuasive decisions." (Citations omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 261–62, 3 A.3d 806 (2010).

Finally, our determination of whether the state constitution affords greater protection than does the federal constitution will dictate the level of judicial review that we ultimately apply to § 52-577d. See, e.g., *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection*, 283 Conn. 86, 98–101, 925 A.2d 1071 (2007); *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 174–75. Like the federal constitution, substantive due process analysis under the state constitution "provides for varying levels of judicial review to determine whether a state statute or regulation passes constitutional muster in terms of substantive due process." *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, supra, 229 Conn. 317–18. Similar to the analysis followed to determine equal protection challenges, statutes that "[impair] a fundamental constitutional right [or target] a suspect class . . . require that this court apply strict scrutiny to determine whether the statute passes muster under our state constitution." Id., 318. Constitutional challenges to ordinary "economic or social welfare legislation" require us to employ a rational basis test to "[ascertain] whether the legislature has acted arbitrarily or irrationally." (Internal quotation marks omitted.) Id. To determine the applicable level of judicial review, we now turn to the *Geisler* analysis.

## A

### Constitutional Language

We begin with the relevant constitutional language. Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ." Its civil counterpart, which is set forth

in article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."[39] This *Geisler* factor does not favor either party, as this generally phrased constitutional language is at best ambiguous with respect to the constitutional issue presented in this appeal.

Although, the language in article first, § 10, of the Connecticut constitution that addresses the right to the administration of justice "without . . . delay" reasonably could be read as supporting the defendant's argument that an extended limitations period reviving a decades old cause of action runs afoul of that constitutional guarantee,[40] that is not the only plausible reading of the provision. Other language in the section assures a "remedy by due course of law," which implicitly supports the constitutionality of revisions to statutes of limitations providing parties with more time to seek damages in cases wherein their injuries either were not readily apparent when suffered, or other factors, such as psychological trauma, kept them from coming forward with their claims.[41] See part IV F of this opinion. Accordingly, we conclude that the constitutional language factor is neutral.

B

Constitutional History

As the parties acknowledge, there is no constitutional history on point from the proceedings of the 1818 or 1965 constitutional conventions. Nevertheless, we conclude that our state's constitutional history provides support for the plaintiff, given "the historical record of the period before and at the time of the adoption of the provision[s]" at issue. *State* v. *Ayala*, 222 Conn. 331, 349, 610 A.2d 1162 (1992). First, statutes of limitations are long rooted in Connecticut's legal history, some predating the enactment of the 1818 constitution. See *Sanborn* v. *Greenwald*, 39 Conn. App. 289, 300, 664 A.2d 803, cert. denied, 235 Conn. 925, 666 A.2d 1186 (1995); see also *Lombard* v. *Edward J. Peters, Jr., P.C.*, 79 Conn. App. 290, 298, 830 A.2d 346 (2003) ("genesis" of personal injury statute of limitations, General Statutes § 52-584, "can be found in 1853 legislation providing for recovery in negligence against railroad companies"); *Sanborn* v. *Greenwald*, supra, 300–301 (noting that General Statutes § 52-577, general tort statute of limitations, has existed since 1821).

It is significant then, that in the years leading to the adoption of our first constitution in 1818, that the legislature had acted to revive time barred actions in a way that affected vested rights, in particular by adopting a 1795 resolution that set aside a 1793 probate court decree, which otherwise could not be appealed because

the eighteen month statute of limitations had lapsed. See *Calder* v. *Bull*, 3 U.S. (3 Dall.) 386, 1 L. Ed. 648 (1798). That 1795 resolution had the effect of disturbing rights to real property that otherwise had vested under the 1793 probate court decree. Id., 386–87; see also id., 401 (establishing that ex post facto clause applies only in criminal cases). That the framers of the 1818 constitution did not act to preclude retroactive revival of time barred claims, in the face of a dispute centered on that point that went to the United States Supreme Court, suggests that the right claimed by the defendant did not exist in the 1818 constitution, which "did not create a government but gave to that which had already been established the sanction of the people and, in very general language, formulated its framework." *Dowe* v. *Egan*, 133 Conn. 112, 119, 48 A.2d 735 (1946). Accordingly, we conclude that the constitutional history factor favors the plaintiff in the present case.

C

Federal Case Law

The relevant federal case law strongly favors the plaintiff, and virtually begs the state constitutional question presented in the present appeal. Specifically, the two leading decisions from the United States Supreme Court, *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, hold that a defendant does not have a vested property right in a statute of limitations defense such that a legislative change reviving an otherwise time barred cause of action violates the defendant's rights under the due process clause of the fourteenth amendment to the United States constitution.

*Campbell*, the leading federal case in this area, was a contracts case from the reconstruction era in which the United States Supreme Court rejected a due process challenge to a provision of the Texas state constitution that had been interpreted to revive actions that had become time barred between the end of the Civil War and the reinstatement of Texas to the union by the Congress of the United States. *Campbell* v. *Holt*, supra, 115 U.S. 621–22. Distinguishing a defense to a cause of action from title to real or personal property derived by the passage of time, such as by adverse possession, the Supreme Court rejected the defendants' claim that the statute of limitations defense "is a vested right, and a right of property which is protected by the provisions of the [f]ourteenth [a]mendment." Id., 628; see also id. ("the word[s] vested right [are] nowhere used in the [c]onstitution, neither in the original instrument nor in any of the amendments to it"). The Supreme Court characterized statutes of limitations as restrictions only on the remedy, and emphasized that "[t]he authorities . . . show that no right is destroyed when the law restores a remedy which had been lost." Id.[42]

The United States Supreme Court unanimously reaffirmed the holding of *Campbell* in *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, which was a challenge to a revised Minnesota "Blue Sky" law that had the effect of reviving certain lapsed securities civil actions. See id., 307–308. Endorsing *Campbell*'s constitutional "hypothesis" that "statutes of limitation go to matters of remedy, not to destruction of fundamental rights," the court described them as "practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. . . . They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the voidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. *Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.*" (Citation omitted; emphasis added; footnote omitted.) Id., 314. Thus, the Supreme Court held that the "[f]ourteenth [a]mendment does not make an act of state legislation void merely because it has some retrospective operation. What it does forbid is taking of life, liberty or property without due process of law. Some rules of law probably could not be changed retroactively without hardship and oppression, and this whether wise or unwise in their origin. Assuming that statutes of limitation, like other types of legislation could be so manipulated that their retroactive effects would offend the [c]onstitution, *certainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is per se an offense against the [f]ourteenth [a]mendment.*"[43] (Emphasis added.) Id., 315–16.

The rule of *Campbell* and *Chase Securities Corp.*, namely, that there is no absolute vested right in a statute of limitations defense absent entry of a final judgment, remains controlling as a matter of federal due process.[44] See, e.g., *Plaut* v. *Spendthrift Farm, Inc.*, 514 U.S. 211, 229, 115 S. Ct. 1447, 131 L. Ed. 2d 328 (1995); *Johnston* v. *Cigna Corp.*, 14 F.3d 486, 492–93 (10th Cir. 1993). Thus, the federal courts review constitutional challenges to statutes that revive otherwise time barred actions using the rational basis test applicable to economic regulation, under which the "relevant inquiry is whether or not the legislation serves a legitimate legislative purpose that is furthered by rational means." *Shadburne-Vinton* v. *Dalkon Shield Claimants Trust*, 60 F.3d 1071, 1076 (4th Cir. 1995); see also, e.g., *Campa-*

*nelli* v. *Allstate Life Ins. Co.*, 322 F.3d 1086, 1100 (9th Cir. 2003) (challenge to statute reviving time barred insurance claims arising from major earthquake is "retrospective economic legislation [that] must only pass rational basis review"); *Shadburne-Vinton* v. *Dalkon Shield Claimants Trust*, supra, 1077 (amendment of state statute of repose that revived time barred claims for injuries caused by use of intrauterine devices was "rationally related to a legitimate legislative purpose" because decade had passed between injuries and discovery of their cause); *Wesley Theological Seminary* v. *United States Gypsum Co.*, 876 F.2d 119, 122 (D.C. Cir. 1989) (The court rejected a due process challenge to the amendment of a statute of repose that revived time barred actions against an asbestos manufacturer because "[w]e cannot say it is irrational for the [trial court] to decide that the losses due to defects in building materials discovered long after installation should fall on the supplier rather than the building's owner" and the "defendant's equities are not especially powerful; the statute of repose became law only in 1972 . . . about 12 years after the last building at issue was completed. Thus [the] defendant made the sales without reliance on the statute." [Citation omitted.]). The federal case law factor, therefore, strongly supports the plaintiff.

## D

### Connecticut Case Law

We conclude that Connecticut case law supports the plaintiff, both with respect to cases concerning § 52-577d and other statutes of limitations specifically, and also as to the constitutionality of retroactive legislation affecting existing legal rights as a more general matter.

### 1

### Section 52-577d and Other Statutes of Limitations

With respect to § 52-577d itself, we deem particularly instructive this court's construction of that statute in *Roberts* v. *Caton*, supra, 224 Conn. 483. In *Roberts*, this court considered, as a matter of statutory construction, whether the legislature intended the 1991 amendments to § 52-577d, which expanded the statute of limitations from two to seventeen years, to apply retroactively to revive the plaintiff's otherwise untimely cause of action against her grandfather. Id., 485–88; see also footnote 37 of this opinion. Relying on the distinction between substantive and procedural legislation discussed in, inter alia, *Moore* v. *McNamara*, 201 Conn. 16, 513 A.2d 660 (1986), *Andrulat* v. *Brook Hollow Associates*, 176 Conn. 409, 407 A.2d 1017 (1979), and *Jones Destruction, Inc.* v. *Upjohn*, 161 Conn. 191, 286 A.2d 308 (1971), this court concluded that the legislature intended the 1991 amendments to § 52-577d to apply retroactively. *Roberts* v. *Caton*, supra, 488. In so concluding, this court emphasized the "general proposition that statutes of limitation

are presumed to apply retroactively," insofar as they are typically considered procedural, rather than substantive, legislation; thus, "unless specifically tied to a statutory right of action or unless a contrary legislative intent is expressed, the statute of limitations in effect at the time an action is filed governs the timeliness of the claim."[45] Id., 488–89. In declining to depart from the presumption of retroactivity, this court observed that neither the statute's language nor the legislative history supported an interpretation of prospective application only. Id., 489.

This court then rejected, inter alia, the defendant's argument that "§ 52-577d as amended altered [his] substantive rights by expanding the period of liability by fifteen years," and disagreed with his "suggest[ion] that a new liability is imposed by the mere fact that a preexisting liability is no longer barred by the passage of time." Id., 492. Observing that "[s]ubstantive rights are those that can be identified as existing between the parties at the time the cause of action accrued"; id., 490; this court rejected the defendant's argument that "§ 52-577d as amended imposed new liabilities"; id.; emphasizing that it "*has never recognized a vested right in the lapsing of a statute of limitations. Although changes in the statute of limitations may not retroactively bar actions already pending . . . they do govern actions brought subsequent to the effective date of the amended statute. . . . We have consistently interpreted the limitations period to be part of the remedy alone, unless the statute in which the period of limitations is found itself creates the right. . . . Therefore, the expansion or reduction alone of the period of limitations, if the statute in which the limitations period is fixed does not also create the right of action, does not by itself alter a substantive right. We conclude, therefore, that § 52-577d as amended did not create a substantive change in the law that would preclude its retroactive application.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 492; accord *Gilbert* v. *Selleck*, 93 Conn. 412, 418, 106 A. 439 (1919) (following *Campbell* in rejecting federal due process challenge to statute that revived otherwise time barred action for contractual indemnity, observing that "statute was the creation of the legislative will, and its repeal did not affect the debt; it merely again permitted the enforcement of an existing obligation"); *Skidmore, Owings & Merrill* v. *Connecticut General Life Ins. Co.*, 25 Conn. Supp. 76, 87, 197 A.2d 83 (1963) (citing *Gilbert* for proposition that there is "no vested right in the bar of the statute"). We acknowledge, however, that *Roberts* does not state a doctrinal basis for its observation that this court "has never recognized a vested right in the lapsing of a statute of limitations"; *Roberts* v. *Caton*, supra, 224 Conn. 492; thus suggesting that the defendant's state constitutional claim is not squarely barred by this court's precedent.

Further, and of additional import under the *Geisler* factor addressing public policy considerations; see part IV F of this opinion; the court in *Roberts* rejected the defendant's claim that, "even if we find that § 52-577d as amended is procedural, it should not apply retroactively because considerations of good sense and justice dictate otherwise." *Roberts* v. *Caton*, supra, 224 Conn. 492. The court acknowledged that the "retroactive application of § 52-577d as amended to this case subjects the defendant to a lawsuit for acts that occurred, most recently, thirteen years ago"; id., 493; but went on to observe that, "[a]lthough statutes of limitation generally operate to prevent the unexpected enforcement of stale claims . . . one object of § 52-577d is to afford a plaintiff sufficient time to recall and come to terms with traumatic childhood events before he or she must take action. The defendant's assertion that he is now unexpectedly exposed to liability was an express purpose of the statute. We see no injustice in retroactively applying § 52-577d as amended so as to effect that purpose." (Citation omitted; footnote omitted.) Id., 493–94; see also *Giordano* v. *Giordano*, supra, 39 Conn. App. 190–92 (rejecting federal equal protection and procedural due process challenge to 1991 amendments to § 52-577 [d] under rational basis review because of state's "legitimate interest" in " allow[ing] victims to recall sexual abuse that had been repressed, and to bring an action against the perpetrators of that abuse as part of the victim's healing process," particularly given that plaintiffs and defendants were affected equally by passage of time); *Almonte* v. *New York Medical College*, 851 F. Supp. 34, 37–38 (D. Conn. 1994) (noting "[l]egislature's intent to broaden the remedies available to victims of sexual abuse through the extended limitations period" and that it "recogniz[ed] that it may take years for a victim to come to terms with the sexual abuse" or "identify those responsible").

In its reply brief and at oral argument before this court, the defendant relied heavily on our recent decision in *Investment Associates* v. *Summit Associates, Inc.*, 309 Conn. 840, 74 A.3d 1192 (2013), which concluded, as a matter of statutory construction, that General Statutes § 52-598 (c) is "not substantive" and applied retroactively to "revive" an unexpired Connecticut judgment to enable its enforcement in other states that have shorter statutory enforcement periods. Id., 868–69. In so holding, we observed in a footnote that certain sister state "cases indicate that retroactive application is proper if the period for enforcing the underlying judgment has not yet expired," and we acknowledged the defendant's argument against retroactive application, founded on *State* v. *Skakel*, supra, 276 Conn. 670, and *State* v. *Crowell*, 228 Conn. 393, 398–99, 636 A.2d 804 (1994), namely, that "§ 52-598 (c) is not akin to a statute of limitations, but, 'even if the statute were viewed as related to a statute of limitations,

*a statute that would modify an expired statute of limitations cannot be applied retroactively.*" (Emphasis altered.) *Investment Associates* v. *Summit Associates, Inc.*, supra, 869 n.17.

Although we declined to consider this argument in *Investment Associates* because it was not properly preserved; see id.; the defendant argues that what we did say about the merits in *Investment Associates* is "suggestive," and that there is, therefore, some significance in the plaintiff's failure to address *Skakel* in his brief. We disagree. The constitutional considerations informing the statutory construction analysis in *Skakel* and *Crowell* are unique to the criminal context, wherein "a law enacted after expiration of a previously applicable limitations period violates the [e]x [p]ost [f]acto [c]lause [of the federal constitution] when it is applied to revive a previously time barred prosecution . . . because it deprives the defendant of a fully vested defense to prosecution, the constitution does not prevent the [s]tate from extending time limits . . . for prosecutions not yet time barred." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Skakel*, supra, 276 Conn. 681, quoting *Stogner* v. *California*, 539 U.S. 607, 632–33, 123 S. Ct. 2446, 156 L. Ed. 2d 544 (2003); see also *Weaver* v. *Graham*, 450 U.S. 24, 28, 101 S. Ct. 960, 67 L. Ed. 2d 17 (1981). Put differently, nothing in footnote 17 of *Investment Associates*, including the citations therein, should be read to reflect our understanding of the constitutional implications of the retroactive revival of time barred civil actions, given the United States Supreme Court's decisions in *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, which are not cited in *Investment Associates*. See also *State* v. *Skakel*, supra, 682 (The court cites *Roberts* and concludes that "subject to the limitations of the ex post facto clause, criminal statutes of limitation . . . should be accorded a presumption of retroactivity. Indeed, we long have held that civil statutes of limitation are presumed to apply retroactively because they do not affect or alter substantive rights.").

Nevertheless, we remain cognizant that statutes of limitations "represent a legislative judgment[46] about the balance of equities in a situation involving the tardy assertion of otherwise valid rights: [t]he theory is that even if one has a just claim it is unjust not to put the adversary on notice to defend within the period of limitation and that the right to be free of stale claims in time comes to prevail over the right to prosecute them." (Footnote added; internal quotation marks omitted.) Id. "The purpose of a statute of limitations is to prevent stale claims and unnecessary delays in the presentation of issues. . . . A plaintiff's timely filed action provides notice to the defendant and ensures that the defendant does not find itself in a situation where, because of the lapse of time, [the defendant] is unable

to gather facts, evidence, and witnesses necessary to afford . . . a fair defense. . . . Statutes of limitations also allow persons, after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability . . . ." (Citations omitted; internal quotation marks omitted.) *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, 314 Conn. 749, 768–69, 104 A.3d 713 (2014). Thus, we acknowledge that statutes of limitations have an important place in our civil justice system, and defendants have a strong interest in their lapse.

### 2

### Connecticut Constitutional Case Law concerning Retroactive Legislation

This court's construction of § 52-577d in *Roberts* v. *Caton*, supra, 224 Conn. 483, accords with its approach to retroactive legislation more generally, beginning nearly two centuries ago with Chief Justice Stephen Hosmer's opinion in *Goshen* v. *Stonington*, supra, 4 Conn. 209. In *Goshen*, this court upheld 1820 legislation that retroactively validated marriages in order to help determine the towns' support obligations to their poor residents. Id., 223; see id., 209–10. Addressing a constitutional challenge to the retroactive effect of the 1820 legislation, the court observed that the "retrospection of the act is indisputable, and equally so is *its purpose to change the legal rights of the litigating parties*," giving rise to the question of "[w]hether in doing this there has been injustice . . . ."[47] (Emphasis added.) Id., 221. The court noted that "[i]t is universally admitted, and unsusceptible of dispute, that there may be retrospective laws impairing vested rights, which are unjust, neither according with sound legislation, nor the fundamental principles 'of the social compact.' If, for example, the legislature should enact a law, without any assignable reason, taking from A. his estate, and giving it to B., the injustice would be flagrant, and the act would produce a sensation of universal insecurity." Id. Nevertheless, the court went on to conclude that "laws of a retroactive nature, affecting the rights of individuals, not adverse to equitable principle, and *highly promotive of the general good*, have often been passed, and as often approved." (Emphasis added.) Id.

Applying this standard, this court held that the 1820 legislation, "thus far *directly operating on vested rights*, is admitted to be unquestionably valid, because it is *manifestly just*." (Emphasis added.) Id., 222. Observing that Connecticut's constitution, unlike that of other states, lacks an express prohibition of retroactive legislation; id., 223; Chief Justice Hosmer emphasized his disagreement with "those, who deny the power of the legislature to make laws, in any case, which, with entire justice, operate on antecedent legal rights. A retrospective law may be just and reasonable; and the right of

the legislature to enact one of this description, I am not speculatist enough to question." Id., 226. Ultimately, the court upheld the 1820 legislation because it "was intended to quiet controversy, and promote the public tranquility." Id., 226; accord *Welch* v. *Wadsworth*, 30 Conn. 149, 155 (1861) (following *Goshen* and emphasizing that constitution lacks provision "restrain[ing] the legislature from passing retrospective laws," and therefore legislature may do so unless "particular retrospective act . . . is shown to the court, with entire clearness and certainty, to *be so unreasonable and unjust in its operation upon antecedent legal rights*, that the action of the legislature can not be vindicated by any reasonable intendment or allowable presumption" [emphasis added]); *Mechanics' & Working-Men's Mutual Savings Bank & Building Assn.* v. *Allen*, 28 Conn. 97, 102 (1859) (following *Goshen* and rejecting "the broad ground that a retroactive law is of course and under all circumstances to be treated as a nullity . . . for healing enactments are found absolutely necessary, continually, and under all governments, to remedy the evils arising from human imperfections").

As the defendant argues, *Goshen* and its progeny embody principles of substantive due process review as applied prior to the enactment of the fourteenth amendment to the United States constitution, particularly given *Goshen*'s reference to the " 'social compact.' " *Washington* v. *Glucksberg*, 521 U.S. 702, 756–57, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997) (Souter, J., concurring). Thus, it is significant that this court has rejected constitutional challenges under *Goshen* v. *Stonington*, supra, 4 Conn. 222, to the retroactive application of numerous statutes that "directly operat[e] on vested rights." See, e.g., *Sanger* v. *Bridgeport*, 124 Conn. 183, 186, 198 A. 746 (1938) (upholding validity of statute curing defective notice of highway defect claim and noting that "[r]emedial statutes may be retrospective in operation provided they do not impair contracts or disturb *absolute* vested rights, but only go to confirm rights already existing *and in furtherance of the remedy*, and by curing defects afford or add to the means of enforcing existing rights or obligations" [emphasis added]); *F.H. Whittelsey Co.* v. *Windsor Locks*, 90 Conn. 312, 315, 97 A. 316 (1916) (Rejecting a challenge to retroactive legislation validating defective property tax liens because "[n]o vested right can be predicated by one who was an owner or mortgagee during the valid existence of the tax lien upon an irregularity of this character. Such a defense would be a purely technical one; it bears no relation to a defense in protection of a vested right."); *Welch* v. *Wadsworth*, supra, 30 Conn. 156–58 (The court rejected constitutional challenge to retroactive legislation intended broadly to validate loans that previously had been deemed usurious under prior statutes).

Thus, we conclude that the Connecticut case law

factor, which significantly informs our state constitutional analysis, favors the position of the plaintiff. Although our state's case law recognizes the defendant's interest in the protection against stale claims afforded by statutes of limitations; see, e.g., *State* v. *Skakel*, supra, 276 Conn. 682–83; it nevertheless embraces the constitutional permissibility of "manifestly just" retroactive legislation affecting existing legal rights and obligations; see *Goshen* v. *Stonington*, supra, 4 Conn. 222; and has interpreted § 52-577d accordingly in *Roberts* v. *Caton*, supra, 224 Conn. 483.

E

Sister State Case Law

The courts of the forty-four states that have considered the issue presented in this appeal take divergent approaches to whether an extended statute of limitations may constitutionally be applied retroactively to revive otherwise time barred claims.[48] Because of the sheer volume of case law addressing this issue, this *Geisler* factor in particular calls for a more rigorous analysis than simply tallying holdings, but rather, requires us to determine which sister state courts' approaches provide a genuinely persuasive framework for resolving this state constitutional question. See, e.g., *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 240–41; see also id., 246 ("[a]lthough the decision of the California Supreme Court and the dissenting opinion of Chief Judge Kaye reflect the minority position, we believe that they nevertheless represent the most persuasive sister state precedent"). Although both parties can claim support from the sister state factor, we conclude that the more persuasive cases ultimately favor the position of the plaintiff.

The courts of eighteen states follow the federal approach embodied in *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, and allow the retroactive expansion of the statute of limitations to revive otherwise time-lapsed claims—seemingly without limitation. Of those states, three, namely, Iowa, West Virginia, and New Mexico, do not squarely ground their decisions in any particular state or federal constitutional provision.[49] One, Georgia, grounds its leading decision, *Canton Textile Mills, Inc.* v. *Lathem*, 253 Ga. 102, 105, 317 S.E.2d 189 (1984), in an interpretation of that state's constitutional provision prohibiting retroactive legislation.[50] Finally, fourteen states, namely, Arizona, California, Delaware, Hawaii, Idaho, Kansas, Massachusetts, Michigan, Minnesota, Montana, New Jersey, North Dakota, Washington, and Wyoming, hold that the retroactive expansion of the statute of limitations to revive time barred claims is not a violation of a defendant's substantive due process rights because there is no vested right to a statute of limitations defense as a matter of state constitutional law. See *Chevron Chemical Co.* v. *Superior Court*, 131

Ariz. 431, 440, 641 P.2d 1275 (1982); *20th Century Ins. Co.* v. *Superior Court*, 90 Cal. App. 4th 1247, 1263–64, 109 Cal. Rptr. 2d 611 (2001), cert. denied, 535 U.S. 1033, 122 S. Ct. 1788, 152 L. Ed. 2d 648 (2002); *Sheehan* v. *Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258–59 (Del. 2011); *Roe* v. *Doe*, 59 Haw. 259, 263, 268–69, 581 P.2d 310 (1978); *Peterson* v. *Peterson*, 156 Idaho 85, 91, 320 P.3d 1244 (2014); *Harding* v. *K.C. Wall Products, Inc.*, 250 Kan. 655, 668–69, 831 P.2d 958 (1992);[51] *Boston* v. *Keene Corp.*, 406 Mass. 301, 312–13, 547 N.E.2d 328 (1989); *Pryber* v. *Marriott Corp.*, 98 Mich. App. 50, 56–57, 296 N.W.2d 597 (1980), aff'd, 411 Mich. 887, 307 N.W.2d 333 (1981) (per curiam); *In re Individual 35W Bridge Litigation*, 806 N.W.2d 820, 830–31 (Minn. 2011); *Cosgriffe* v. *Cosgriffe*, 262 Mont. 175, 180, 864 P.2d 776 (1993); *Panzino* v. *Continental Can Co.*, 71 N.J. 298, 304–305, 364 A.2d 1043 (1976);[52] *In re Interest of W.M.V.*, 268 N.W.2d 781, 786 (N.D. 1978); *Lane* v. *Dept. of Labor & Industries*, 21 Wn. 2d 420, 426, 151 P.2d 440 (1944); *Vigil* v. *Tafoya*, 600 P.2d 721, 724–25 (Wyo. 1979).

In contrast, the courts of twenty-four states support the position that legislation that retroactively amends a statute of limitations in a way that revives time barred claims is per se invalid. Of those states, seven, namely, Alabama, Colorado, Missouri, New Hampshire, Oklahoma, Tennessee, and Texas, ground their holdings in independent state constitutional provisions prohibiting retroactive legislation.[53] One, Vermont, grounds that holding in a state statute prohibiting retroactive legislation.[54] Five, namely, Indiana, Kentucky, Maine, Oregon, and Pennsylvania, do not cite a source for the vested right or otherwise perform a constitutional analysis in support of this holding.[55] This leaves eleven states, Arkansas, Florida, Illinois, Louisiana, Nebraska, North Carolina, Rhode Island, South Carolina, South Dakota, Utah, and Virginia, which have rejected the United States Supreme Court's approach to this issue in *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, and held, as a matter of state constitutional law, that the retroactive expansion of the statute of limitations, which revives an otherwise time-lapsed claim, is an incursion on a vested property right that amounts to a per se violation of substantive due process. See *Johnson* v. *Lilly*, 308 Ark. 201, 203–204, 823 S.W.2d 883 (1992); *Wiley* v. *Roof*, 641 So. 2d 66, 68–69 (Fla. 1994); *Doe A.* v. *Diocese of Dallas*, 234 Ill. 2d 393, 409, 917 N.E.2d 475 (2009); *Henry* v. *SBA Shipyard, Inc.*, 24 So. 3d 956, 960–61 (La. App. 2009) (en banc), writ denied, 27 So. 3d 853 (La. 2010); *Givens* v. *Anchor Packing, Inc.*, 237 Neb. 565, 571–72, 466 N.W.2d 771 (1991); *Colony Hill Condominium Assn.* v. *Colony Co.*, 70 N.C. App. 390, 394, 320 S.E.2d 273 (1984); *Kelly* v. *Marcantonio*, 678 A.2d 873, 883 (R.I. 1996);[56] *Doe* v. *Crooks*, 364 S.C. 349, 351–52, 613 S.E.2d 536 (2005); *State of Minnesota ex rel. Hove* v.

*Doese*, 501 N.W.2d 366, 370 (S.D. 1993); *Roark* v. *Crabtree*, 893 P.2d 1058, 1062–63 (Utah 1995); *Starnes* v. *Cayouette*, 244 Va. 202, 212, 419 S.E.2d 669 (1992).[57]

Finally, the courts of Wisconsin and New York navigate between the poles of the broadly permissive federal approach embodied in *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, and the absolute bar analysis followed by those state courts that have rejected the Supreme Court's reasoning in those cases. The New York Court of Appeals has held that the legislature "may constitutionally revive a personal cause of action" if it reasonably determines that "the circumstances are exceptional and are such as to satisfy the court that serious injustice would result to plaintiffs not guilty of any fault if the intention of the [l]egislature were not effectuated."[58] *Gallewski* v. *Hentz & Co.*, 301 N.Y. 164, 174–75, 93 N.E.2d 620 (1950). The Wisconsin Supreme Court recognizes that there is a vested right in the lapse of statutes of limitations, but nevertheless has utilized the rational basis standard to analyze the constitutionality of a revival statute amending the workers' compensation statute of limitations by balancing (1) "the private interests overturned by this retroactive legislation, including any unfairness inherent in its application"; and (2) "the public interest served by retroactive application" of the statutes at issue. *Society Ins.* v. *Labor & Industrial Review Commission*, 326 Wis. 2d 444, 472–76, 786 N.W.2d 385 (2010); cf. *In re Individual 35W Bridge Litigation*, supra, 806 N.W.2d 833 (recognizing constitutionally protected property right in statute of repose, but applying rational basis review to uphold revival statute authorizing state to seek indemnity from third parties for compensation it had paid to victims of major bridge collapse because "protectable property right" is "not absolute and must be balanced against the [s]tate's legitimate interest in addressing . . . a 'catastrophe of historic proportions' ").[59]

Although both parties can claim some support from the sister state case law factor, we conclude that, on balance, it ultimately favors the position of the plaintiff. The decisions that follow the federal approach embodied in *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, are most consistent with our own body of case law in this area; see part IV D of this opinion; and our constitutional history. See part IV B of this opinion.

F

Contemporary Economic and Sociological
Public Policies

Although both parties' public policy arguments are well taken, this factor favors the plaintiff because of the actions of our legislature, which has the primary responsibility for formulating the public policy of our

state. The defendant points out, however, in arguing that "[a]llowing a cause that expired in 1988 to be brought in 2008 does enormous economic and sociological harm," that it is well settled that statutes of limitations "prevent stale claims and unnecessary delays in the presentation of issues," and serve the salutary purpose of "allow[ing] persons, after the lapse of a reasonable time, to plan their affairs with a reasonable degree of certainty, free from the disruptive burden of protracted and unknown potential liability . . . ." (Internal quotation marks omitted.) *Electrical Contractors, Inc.* v. *Ins. Co. of the State of Pennsylvania*, supra, 314 Conn. 768–69. Put differently, statutes of limitations "prevent the unexpected enforcement of stale claims concerning which the persons interested have been thrown off their guard by want of prosecution."[60] (Internal quotation marks omitted.) *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 584, 512 A.2d 893 (1986); accord *State* v. *Skakel*, supra, 276 Conn. 682–83.

On the other hand, the plaintiff emphasizes the "legitimate legislative purpose" of § 52-577d, as explained in *Roberts* v. *Caton*, supra, 224 Conn. 493–94, namely, "to afford a plaintiff sufficient time to recall and come to terms with traumatic childhood events before he or she must take action," with a defendant being "now unexpectedly exposed to liability . . . an express purpose of the statute." Indeed, Senator Anthony Avallone, reflected on " 'substantial testimony before the [Judiciary] Committee that minor victims of sexual assault often do not understand or recognize the damage which they have sustained until a substantial number of years after they attain majority. In fact, it is not just two or three years, but can be substantially longer than that. . . . So the [Judiciary] Committee in recognition of that extends the statute of limitations on which one can bring an action.' " Id., 493 n.8, quoting 34 S. Proc., Pt. 7, 1991 Sess., p. 2495.

The public policy objective argued by the plaintiff finds support from numerous commentators. In one significant example, Professor Marci Hamilton observes that "[l]egislation that eliminates the civil [statute of limitations] or includes a discovery rule is supported by various studies on the long-term effects of child molestation and the likely delay in disclosure. Researchers in various studies have found—specifically in men who were sexually abused as children—that long-term adaptation will often include sexual problems, dysfunctions or compulsions, confusion and struggles over gender and sexual identity, homophobia and confusion about sexual orientation, problems with intimacy, shame, guilt and self-blame, low self-esteem, negative self-images, increased anger, and conflicts with authority figures. There is also an increased rate of substance abuse, a tendency to deny and delegitimize the traumatic experience, symptoms of [p]ost [t]raumatic [s]tress [d]isorder, and increased probability of

fear and depression for all victims. Often, it is not until years after the sexual abuse that victims experience these negative outcomes. As clinician Mic Hunter has observed: 'Some of the effects of sexual abuse do not become apparent until the victim is an adult and a major life event, such as marriage or birth of a child, takes place. Therefore, a child who seemed unharmed by childhood abuse can develop crippling symptoms years later . . . .' " (Footnotes omitted.) M. Hamilton, "The Time Has Come for a Restatement of Child Sex Abuse," 79 Brook. L. Rev. 397, 404–405 (2014). Another salutary effect of revival statutes like § 52-577d is that "lawsuits filed under window legislation have led to the public identification of previously unknown child predators, which reduces the odds that children will be abused in the future."[61] Id., 405.

In our view, the public policy *Geisler* factor favors the plaintiff. Given the reasonable policy concerns that support the parties' respective state constitutional arguments, in interpreting our state's constitution, we must defer to the legislature's "primary responsibility" in pronouncing the public policy of our state.[62] *Thibodeau* v. *Design Group One Architects*, *LLC*, 260 Conn. 691, 715, 802 A.2d 731 (2002); see also *State* v. *Lockhart*, 298 Conn. 537, 574, 4 A.3d 1176 (2010) (This court declined to adopt the state constitutional rule requiring the recording of custodial interrogations because, although that rule would likely be beneficial, "[d]etermining [its] parameters . . . requires weighing competing public policies and evaluating a wide variety of possible rules. . . . In our view, such determinations are often made by a legislative body because it is in a better position to evaluate the competing policy interests at play . . . ." [Citation omitted.]). Such factual matters within the legislative purview include the balancing of interests that are accommodated by statutes of limitations. See, e.g., *Daily* v. *New Britain Machine Co.*, supra, 200 Conn. 582–84 (rejecting claim that products liability repose period violates plaintiffs' due process rights by "bar[ring] a cause of action even before it accrues" because of legislative finding that "occasional hardship" to plaintiffs "is outweighed by the advantage of outlawing stale claims" [internal quotation marks omitted]). Accordingly, we conclude that this *Geisler* factor favors the plaintiff, given that § 52-577d effectuates a clearly established legislative policy.

G

Conclusion

Having reviewed the wealth of persuasive and relevant materials revealed by our *Geisler* analysis, we conclude that the retroactive application of § 52-577d to revive the plaintiff's otherwise time barred claims does not violate the defendant's substantive due process rights under our state constitution. Consistent with our observation in *Roberts* v. *Caton*, supra, 224 Conn. 492,

that this court "has never recognized a vested right in the lapsing of a statute of limitations," more than one century of Connecticut case law, beginning with *Goshen* v. *Stonington*, supra, 4 Conn. 221–22, has sustained retroactive legislation that affects significant legal interests. Our constitutional history following *Calder* v. *Bull*, supra, 3 U.S. (3 Dall.) 386, suggests that the retroactive revival of time barred claims did not offend the drafters of our 1818 constitution. This significant legal background, unique to Connecticut, does not support the defendant's claim that we should follow the decisions of our sister states that have rejected the United States Supreme Court's decisions in *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, and have adopted an approach imposing an absolute constitutional bar on changes to statutes of limitations that would operate retroactively to revive time barred actions.

Thus, because our *Geisler* analysis indicates that the state constitution does not provide greater protection to the defendant's interest in the lapse of the statute of limitations than is afforded under the federal constitution, we analyze the defendant's substantive due process challenge to the constitutionality of § 52-577d under the "rules that normally govern constitutional challenges of economic or social welfare legislation," which require us to employ a rational basis test to "[ascertain] whether the legislature has acted arbitrarily or irrationally." (Internal quotation marks omitted.) *Fair Cadillac-Oldsmobile Isuzu Partnership* v. *Bailey*, supra, 229 Conn. 318; accord *Daily* v. *New Britain Machine Co.*, supra, 200 Conn. 577–83 (considering right of access and equal protection challenges to products liability statute of limitations under rational basis standard); see also *Contractor's Supply of Waterbury, LLC* v. *Commissioner of Environmental Protection*, supra, 283 Conn. 108 (rejecting state constitutional due process challenge to statute that prevented plaintiff from constructing new asphalt plant, despite its property interest in holding permit to do so, because statute "is rationally related to a legitimate state purpose, protecting the environment and public health").

This court previously has determined that "considerations of good sense and justice" support the retroactive application of the extended statute of limitations of § 52-577d as a matter of statutory construction. *Roberts* v. *Caton*, supra, 224 Conn. 493. Consistent with the public policy objectives discussed in part IV F of this opinion, the legislature, in extending § 52-577d and applying it retroactively, balanced the fact that some defendants may be exposed to "unexpected" liability; id., 494; with a recognition that "it may take years for a victim to come to terms with the sexual abuse," and an implicit understanding "that it may take as much time to identify those responsible for the abuse . . . ." *Almonte* v. *New York Medical College*, supra, 851 F.

Supp. 37–38. Given the unique psychological and social factors that often result in delayed reporting of childhood sexual abuse, which frustrated the ability of victims to bring an action under earlier revisions of the statute of limitations, we cannot say that the legislature acted unreasonably or irrationally[63] in determining that the revival of child sexual abuse victims' previously time barred claims serves a legitimate public interest and accomplishes that purpose in a reasonable way. "[A]lthough [the] rational-basis standard is not a toothless one  .  .  .  it does not allow us to substitute our personal notions of good public policy for those of [the legislature]  .  .  .  ." (Citation omitted; internal quotation marks omitted.) *Schweiker* v. *Wilson*, 450 U.S. 221, 234, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981). Accordingly, we conclude that the retroactive application of § 52-577d, which revived the plaintiff's otherwise time barred claims, did not violate the defendant's substantive due process rights under the Connecticut constitution.

The judgment is affirmed.

In this opinion ROGERS, C. J., and PALMER, EVELEIGH and McDONALD, Js., concurred.

[1] On June 23, 2008, the trial court, *Tyma, J.*, granted the plaintiff permission to proceed under the pseudonym Jacob Doe. On February 9, 2012, the trial court, *Dubay, J.*, vacated that order with the consent of the parties. At oral argument before this court, the plaintiff's counsel indicated that the plaintiff did not wish to remain anonymous, and referred to the plaintiff by his given name. Although, in a civil case, we ordinarily would respect the wishes of a victim of sexual abuse to use his given name, doing so in the present case may help to identify at least one other victim of Ferguson's sexual abuse. Consistent with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child; see General Statutes § 54-86e; in the absence of evidence indicating that the other victim would also wish to be identified, we decline to identify the plaintiff or other individuals through whom that victim may be identified.

[2] The defendant filed two appeals from the judgment of the trial court to the Appellate Court, one following the denial of its motion to set aside the jury's verdict, and the other following the trial court's award of punitive damages. See *Hylton* v. *Gunter*, 313 Conn. 472, 487, 97 A.3d 970 (2014). Those appeals were then consolidated for purposes of argument and decision. We subsequently transferred the consolidated appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] We note that the American Psychiatric Association defines "pedophilic disorder" in a manner that requires sexual attraction to, or engaging in sexual behaviors with, "a *prepubescent* child or children (generally age [thirteen] years or younger)." (Emphasis added.) American Psychiatric Assn., Diagnostic and Statistical Manual of Mental Disorders (5th Ed. 2013) p. 697. Because the record does not indicate that the acts of molestation described in this case all involved prepubescent children, the numerous references in this opinion to pedophilia encompass sexual attraction to, or engaging in sexual behaviors with, all individuals who are "legally considered to be children." K. Lanning, Child Molesters: A Behavioral Analysis for Professionals Investigating the Sexual Exploitation of Children (5th Ed. 2010) p. 21, available at http://www.missingkids.com/en_US/publications/NC70.pdf (last visited June 22, 2015). We note that this definition is consistent with the record, the arguments presented by the parties, and common usage. See Merriam-Webster's Collegiate Dictionary (11th Ed. 2003).

[4] General Statutes § 52-577d provides: "Notwithstanding the provisions of section 52-577, no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than thirty years from the date such person attains the age of majority." For the legislative genealogy of § 52-577d, see footnote 37 of this opinion.

[5] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall  .  .  .  be deprived of life, liberty or property without

due process of law . . . ."

Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[6] Gianelli testified that Whealon never discussed with him any plan to get help for the boys who Ferguson had molested, and he did not know whether Whealon or anyone else affiliated with the defendant had ever reached out to the mother who made the report. Gianelli also testified that he never personally reported the allegations of molestation to state authorities, and he did not know whether anyone else affiliated with the defendant had so reported.

[7] Kvedas testified that he was aware of Ferguson's alcohol problems, but was never told that Ferguson had molested boys.

[8] On June 22, 1981, Peterson sent Whealon a letter supporting Ferguson's request for "a more exciting teaching assignment," noting that he "has made a great deal of progress over the two-year period of sobriety." Peterson stated that it was his "professional opinion that the other issues that brought . . . Ferguson to us for treatment will be in control as long as the disease of alcoholism is in control," thus indicating his "support for any change that would include a change in teaching assignment, as well as his continued participation in parochial ministry."

Thereafter, on August 26, 1981, Peterson and a therapist from the Saint Luke Institute issued a report to Whealon indicating that Ferguson: (1) had been alcohol and drug free for the preceding two years, and had been attending weekly Alcoholics Anonymous meetings; (2) was successfully working as a grade school principal, despite the fact that he had not received his preferred assignment of working in an all boys school; and (3) had mild neuropsychological impairments that "may be the residual effect from a more severe previous brain involvement." To aid Ferguson in maintaining his "sustained sobriety and improved ministry and life," they recommended continued after care, monthly telephone contact with the Saint Luke Institute, and regular participation in Alcoholics Anonymous.

[9] Dougherty did not know whether anyone else at Saint Mary's School or Saint Mary's Parish was ever informed about Ferguson being a danger to young boys. She never, however, personally witnessed Ferguson doing anything improper or heard of any complaints to that effect.

[10] The plaintiff's family members were observant Catholics who participated in a variety of church activities. His father was a deacon and the plaintiff served as an altar boy at the Good Shepherd Parish in Seymour, where they lived. The plaintiff's parents, who had befriended numerous priests in Saint Mary's Parish, taught him to give priests a high level of respect.

[11] Unaware of any inappropriate activity, the plaintiff's parents gave permission for at least one of these sleepovers to occur, and did not recall whether they had given permission for the others.

[12] The plaintiff, however, testified that he did not know whether Bollea had ever seen him at the rectory during the sleepovers.

[13] These molestations included voyeurism, oral sex, and fondling. Other molestations took place during sleepovers at the home of Ferguson's friend, Michael Hunter, who was a music teacher at an all boys school; at those sleepovers, Ferguson and Hunter gave the plaintiff and R wine before inviting them to watch pornographic movies and molesting them.

[14] At one point, prompted by news coverage of other incidents involving Ferguson, the plaintiff's parents asked him as an adult whether he had ever been molested by Ferguson. At that time, the plaintiff denied any molestation.

[15] The plaintiff testified that he and his wife divorced in 2011, largely because of stress occasioned by the present action.

[16] Specifically, the plaintiff claimed that the defendant: (1) knew or should have known of Ferguson's proclivities to sexually abuse minors; (2) failed to supervise him adequately; (3) failed to report Ferguson's conduct to authorities; (4) retained him, despite the fact that it should have known that he was a danger to young boys; (5) failed to remove him from any position despite knowing or having reason to know that he was a danger to minors; (6) failed to conduct an adequate investigation of Ferguson and other priests; (7) failed to establish and maintain a sexual abuse reporting policy; (8) failed to take remedial actions to protect minors; (9) failed to warn its congregations, parishioners, and employees of the threat Ferguson posed; and (10) failed to promulgate policies against having children in private quarters or taking them on unchaperoned trips.

In a subsequent amended complaint, the plaintiff, inter alia, relied specifi-

cally on Bollea's failures to prevent Ferguson from being alone with the plaintiff and R behind closed doors at the rectory, and to alert Whealon or other officials of these events. The plaintiff also contended that the fact that Whealon and other officials affiliated with the defendant knew in March, 1979, that at least four boys had been sexually abused by Ferguson, "should have given [the defendant] a reasonable basis to believe that . . . Ferguson's sexual attraction to young boys and his acting upon such attraction was of such a serious and dangerous psychological problem to compel [Whealon's] forbidding of . . . Ferguson to have contact with minor children."

[17] Previously, the defendant had filed a motion for a directed verdict challenging the action as time barred and lacking sufficient evidence of negligence and recklessness, upon which the trial court had reserved judgment.

[18] The defendant questions how "jurors in 2012, applying only their common knowledge and experience, [could] fairly conclude that a reasonable person *in 1981* should have realized that a priest who had a drinking problem and who had engaged in sexual misconduct with adolescent males could not safely be returned to parish service even though he had received evaluation and treatment at a mental health facility, had stopped drinking, and his psychiatrist and other therapists supported his return and assured the [arch]bishop that the priest could safely be placed in a parish ministry." (Emphasis in original.)

[19] The plaintiff posits that Ferguson's "alleged medical condition" and the curability of pedophilia is "irrelevant to the reasonable steps necessary to protect others," observing colorfully that "[n]o matter how 'medical' the cause of an alcoholic [axe] murderer's actions in murdering six victims, no reasonable person obtains a favorable psychiatric report, hands the man an [axe], hides his prior conduct from the weakest, most vulnerable members of the defendant's community, and says, 'don't drink!' "

[20] Thus, we disagree with the defendant's characterization in its reply brief of the plaintiff's argument as resting on "nothing more than assumption, that Ferguson's relapse was 'obviously foreseeable' and that 'everybody' knows pedophilia [cannot] be cured. While some courts might agree with that proposition today, how can it be assumed that it was common knowledge in 1979–1983 that a person with those tendencies could not be cured or controlled by psychological/psychiatric treatment?" (Footnote omitted.) The defendant posits that it was the plaintiff's "obligation . . . to provide the jury with some evidence upon which they could properly conclude that reasonable people in 1979–1983, knowing what . . . Whealon knew, including the advice [from] Peterson, would have realized that Ferguson had not been rehabilitated but was likely to reoffend." As the parties' summations indicate, this case boiled down to the reasonableness of assuming that Ferguson would not relapse, given Whealon's understanding that alcohol triggered Ferguson's pedophilic behaviors—not that those behaviors had in fact been "cured."

[21] That relapse is a matter of common knowledge is embodied in the usage of the idiom, for more than one century, characterizing one's recovery status as being "on" or "off the wagon." See Urban Dictionary, "Fell Off the Wagon," available at http://www.urbandictionary.com/define.php?term= fell+off+the+wagon (last visited June 22, 2014) (defining "fell off the wagon" as "[w]hen one resumes an addictive/compulsive behavior that they are trying to control" and stating that phrase "[o]riginally referred . . . to drinking"); see also E. Partridge, A Dictionary of Slang and Unconventional English (4th Ed. 1951) p. 941 (noting that "on the water-waggon" means "tee-total for the time-being," and has been used in United States since 1904); H. Wentworth & S. Flexner, Dictionary of American Slang (1960) p. 566 (defining "on the wagon" as "[n]ot drinking alcoholic beverages, either for a short or long period" and noting that wagon idioms have been "universally popular" since 1905).

[22] This case is distinguishable from the Florida and Illinois cases on which the defendant relies, wherein historical testimony about prevailing understandings was admitted to show that the defendant should have been aware of certain risks. Those cases are not persuasive because they merely mention the fact that expert testimony from historians was admitted; they did not hold that expert testimony was *required* to establish the standard of care, or even discuss its admissibility more generally. See *Philip Morris USA, Inc.* v. *Kayton*, 104 So. 3d 1145, 1148–49 (Fla. App. 2012) (plaintiff presented testimony of historian who was expert on tobacco industry to establish that tobacco companies had formed "Tobacco Institute" to "create a doubt that

there was a causal link between cigarettes and disease," which supported verdict of conspiracy to commit fraudulent concealment); *Rodarmel* v. *Pneumo Abex, LLC*, 957 N.E.2d 107, 126 (Ill. App. 2011) (describing expert testimony offered by plaintiff, including discussion of texts from 1913 and 1924 about danger of bringing " 'poisonous dust' from the workplace into the home," in support of proposition that asbestos company should have known of risk to workers of carrying asbestos dust home on their clothing), appeal denied, 968 N.E.2d 1072 (Ill. 2012). In contrast, the central question before the jury in the present case was *not* whether the defendant should have known of the risk of sexual abuse and accommodated that potentiality by adopting certain practices and procedures. Rather, it concerned how the defendant reacted to what it actually knew, namely, that it had in one of its schools a known sex offender whose tendencies were triggered by the consumption of alcohol.

[23] The plaintiff also relies on *Paiva* v. *Vanech Heights Construction Co.*, 159 Conn. 512, 271 A.2d 69 (1970), and contends that this claim is moot because of the defendant's failure to challenge two independent factual bases for the jury's negligence verdict as demonstrated in the interrogatories, namely its failure to inform parents and teachers of Ferguson's propensities and its failure to remove Ferguson from any position with the defendant. The plaintiff is correct that "where alternative grounds found by the reviewing court and unchallenged on appeal would support the trial court's judgment, independent of some challenged ground, the challenged ground that forms the basis of the appeal is moot because the court on appeal could grant no practical relief to the complainant." *Green* v. *Yankee Gas Corp.*, 120 Conn. App. 804, 805, 993 A.2d 982 (2010). We disagree, however, with the plaintiff's understanding of the record and the defendant's briefing of this claim. We view the defendant's expert testimony claim; see part I A of this opinion; as encompassing a challenge to the jury's failure to remove finding, and we read the defendant's briefing of this claim as encompassing both negligent supervision and failure to warn, which are conceptually related matters on the facts of this case.

[24] Thus, we disagree with the defendant's reliance on *Paige* v. *St. Andrew's Roman Catholic Church Corp.*, supra, 250 Conn. 14. In *Paige*, this court concluded that there was insufficient evidence beyond speculation to prove that one of the agents, servants or employees of the defendant, a church, had activated a large heating boiler by operating circuit breakers and emergency switches while the plaintiff was inside the boiler to clean it, severely injuring him. See id., 16–17. The court determined that the jury's verdict could not have been supported by the evidence "given the lack of any factual support for the inference that any of [the defendant's agents, servants, or employees] was even in the church on the morning of the accident"; id., 31; and given that the jury specifically had found that the church's maintenance supervisor, its only employee "placed near the boiler room on the morning of the accident, had not activated the controls that caused the boiler to ignite." (Footnote omitted.) Id., 29. Most significantly, this court determined that the jury's finding that the maintenance supervisor was negligent when he "failed to deactivate the boiler that the plaintiff was cleaning," had no "causal connection" to the plaintiff's injuries because the plaintiff's coworker "testified that prior to commencing the cleaning of the boilers on the morning of the accident, he had made sure that all of the switches and the controls to the boilers were off. Thus, the jury properly could not have based their findings on a disbelief of [the maintenance supervisor's] testimony . . . ." Id.; see also id., 29–30 ("[b]ecause [the maintenance supervisor] was the only employee of the defendant placed near the boiler room on the morning of [the accident], this break in the chain of events connecting his conduct to the plaintiff's injuries is fatal to the plaintiff's claim"). That specific set of jury findings, which combined to undermine the jury's verdict, render *Paige* distinguishable from the present case.

[25] The defendant also relies on an "irregularity in connection with the delivery of the verdict [that] suggests that the jury may not have given the question of reckless misconduct proper consideration," namely, that the jury had failed to complete the interrogatory form when it first delivered its verdict, and then took only five minutes to complete the form upon being sent back to deliberate. Given that there is no challenge to the trial court's jury instructions, and "[o]ur jurisprudence is clear . . . that unless there is a clear indication to the contrary, a jury is presumed to follow the court's instructions"; *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 335, 838 A.2d 135 (2004); we decline to join the defendant in speculating on whether the jury "appreciate[d] the significance of the distinc-

tion between negligence and recklessness as explained to them in the charge.”

[26] Section 7-2 of the Connecticut Code of Evidence provides: “A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue.”

[27] The defendant cites four cases in support of its contention that, in “unusual cases where a fact finder must put itself back in time to properly review and evaluate evidence, courts permit the type of expert evidence . . . Jenkins was offering.” See *Walden* v. *Chicago*, 755 F. Supp. 2d 942, 947–53 (N.D. Ill. 2010) (historian qualified to testify to establish city police department’s practices in 1952 in support of plaintiff’s claim of constitutional injury arising from false confession occasioned by coercive interrogation); *Waterhouse* v. *R.J. Reynolds Tobacco Co.*, 368 F. Supp. 2d 432, 437 (D. Md. 2005) (requiring competent historians’ testimony to establish “common knowledge” of dangers of cigarette smoking from 1940s through 1960s), aff’d, 162 Fed. Appx. 231 (4th Cir. 2006); *Philip Morris USA, Inc.* v. *Kayton*, 104 So. 3d 1145, 1148–49 (Fla. App. 2012) (not considering admissibility, but noting that plaintiff presented testimony of historian to establish that tobacco companies had formed Tobacco Institute “to create a doubt that there was a causal link between cigarettes and disease,” which supported verdict of conspiracy to commit fraudulent concealment); *Rodarmel* v. *Pneumo Abex, LLC*, 957 N.E.2d 107, 126 (Ill. App. 2011) (not considering admissibility, but describing expert testimony offered by plaintiff, including discussion of texts from 1913 and 1924 about danger of bringing “ ‘poisonous dust’ from the workplace into the home,” in support of proposition that asbestos company should have known of risk to workers of carrying asbestos dust home on their clothing), appeal denied, 968 N.E.2d 1072 (Ill. 2012); see also *Krik* v. *Crane Co.*, United States District Court, Docket No. 10CV7435 (JZL) (N.D. Ill. October 21, 2014) (expert qualified to testify about historical development of knowledge of health hazards of asbestos in support of toxic tort element of what manufacturer knew or should have known about dangers of its product). We agree with the plaintiff’s argument that these cases are inapposite because whether the defendant knew or should have known of Ferguson’s conduct was not a contested issue in the present case, and none of these cases supported the use of historical testimony to establish the standard of care.

[28] We acknowledge the plaintiff’s argument, also made before the trial court, that Jenkins’ testimony was “demonstrably false,” insofar as “[p]eople at the time were well aware that sexual molesters could be repeat offenders and that it resulted in permanent harm,” as shown by the fact that, in 1981, child molestation was a felony under Connecticut law and also was the subject of mandatory reporting laws. We conclude that these points do not affect the admissibility of Jenkins’ testimony, given his reasonable qualifications as a historian, but rather, go to its weight. See, e.g., *Weaver* v. *McKnight*, 313 Conn. 393, 408–409, 97 A.3d 920 (2014).

[29] The defendant makes a similar argument in contending that the deposition testimony was similarly inadmissible under the former testimony exception to the hearsay rule. See Conn. Code Evid. § 8-6 (1). Because of our conclusion with respect to the residual exception, we need not address the defendant’s former testimony arguments.

[30] The plaintiff further contends that any error in admitting this evidence was harmless because whether Ferguson was actually treated for pedophilia is not dispositive in this case, insofar as a “reasonable jury could have found that Ferguson had received state of the art ‘treatment’ for pedophilia and still reached the same result.”

[31] Practice Book § 13-3 provides in relevant part: “(a) Subject to the provisions of Section 13-4, a party may obtain discovery of documents and tangible things otherwise discoverable under Section 13-2 and prepared in anticipation of litigation or for trial by or for another party or by or for that other party’s representative only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means. . . .”

[32] We note that the relevant deposition begins with Ferguson recounting a conversation that he had with Whealon upon the 1979 decision to remove Ferguson from teaching at Northwest; Ferguson stated that the “substance [of that conversation] was that we will send you to treatment for alcoholism.”

The questioning continued:

"Q. Besides alcoholism, was there anything else discussed regarding treatment, besides treatment for alcoholism . . . was there treatment for anything else discussed in that conversation.

"A. No.

"Q. And what arrangements were made, do you recall?

"A. Arrangements were made for me to enter [the Saint Luke Institute] in Holliston, Massachusetts, for treatment.

"Q. And what kind of institute is [the Saint Luke Institute]?

"A. [The Saint Luke Institute] is a treatment facility for priests, nuns, and brothers who are in trouble with alcohol or drugs. . . .

"Q. And does the name Michael Peterson ring a bell?

"A. Yes.

"Q. Who is he?

"A. He was the director.

"Q. Did you get any treatment for sexual disorders there?

"A. No.

"Q. Did [Whealon] order you to leave Northwest . . . ?

"A. Well, no, he told me that I needed treatment for alcoholism and that the [defendant] would provide that."

The deposition continued:

"Q. Did you ever have support group meetings at [the Saint Luke Institute]?

"A. Oh, yes.

"Q. Was sexual attraction to minors ever discussed in [these] meetings by anybody?

"A. No."

[33] In its sixth special defense, the defendant asserted that the "court should exercise its power in equity to bar [the] plaintiff's claim on the basis of laches in that the plaintiff failed to exercise due diligence and inexcusably delayed bringing his lawsuit to the great prejudice of the defendant in that many important and material witnesses have passed away, most notably . . . Whealon and . . . Ferguson."

[34] The Appellate Court also discussed this court's decision in *Dunham* v. *Dunham*, 204 Conn. 303, 326–27, 528 A.2d 1123 (1987), and observed that, "in equitable actions, where the defense of laches is asserted, courts may look by analogy to the statute of limitations on the underlying legal action, courts may not, as the defendant attempts to do here, commingle the legal concept of a statute of limitations and the equitable doctrine of laches." *Giordano* v. *Giordano*, supra, 39 Conn. App. 215–16.

[35] Examples of the application of this well established principle abound in the case law of this state. Compare *DaimlerChrysler Ins. Co.*, *LLC* v. *Pambianchi*, 762 F. Supp. 2d 410, 424 (D. Conn. 2011) (laches not available defense to indemnification claim because plaintiff filed action "within the relevant four-year statute of limitation to enforce an indemnification clause in a lease agreement" and "[t]he [c]ourt is not persuaded that there is anything exceptional about this case that would permit [the defendant] to assert laches as a defense"), aff'd, 469 Fed. Appx. 65 (2d Cir. 2012), *Florian* v. *Lenge*, 91 Conn. App. 268, 282, 880 A.2d 985 (2005) (laches unavailable because "the plaintiff's complaint was one for the collection of payment due on a promissory note, which is an action at law" and request in complaint for " '[s]uch other and further relief as the Court deems just and proper' is not a specific demand for equitable relief"), *John H. Kolb & Sons, Inc.* v. *G & L Excavating, Inc.*, 76 Conn. App. 599, 612–13, 821 A.2d 774 (laches not available, despite defendant's claimed prejudice because its "records regarding the dispute were lost and [it] was unable to recall the circumstances of the dispute," because breach of contract action was "an action at law . . . filed within the applicable statute of limitations"), cert. denied, 264 Conn. 919, 828 A.2d 617 (2003), and *Torringford Farms Assn., Inc.* v. *Torrington*, 75 Conn. App. 570, 576, 816 A.2d 736 ("For actions for breach of contract, it is the legislature that has determined the time period in which a cause of action must be brought. Only in actions that fairly can be characterized as invoking equitable considerations may a court consider the applicability of concepts of fairness and equity, usually by invoking the doctrine of laches."), cert. denied, 263 Conn. 924, 823 A.2d 1217 (2003), with *Sean O'Kane A.I.A. Architect, P.C.* v. *Puljic*, 148 Conn. App. 728, 740–41, 87 A.3d 1124 (2014) (laches available because plaintiff sought equitable remedy of unjust enrichment), and *Cifaldi* v. *Cifaldi*, 118 Conn. App. 325, 335 n.8, 983 A.2d 293 (2009) (laches available because "court order designed to protect the integrity of the original judgment, which is what the plaintiff has requested here, is an exercise of the court's equitable power").

[36] Accordingly, we decline the defendant's invitation to follow the reasoning of cases such as *Teamsters & Employers Welfare Trust of Illinois* v. *Gorman Bros. Ready Mix*, supra, 283 F.3d 880–81, and *Dept. of Banking & Finance* v. *Wilken*, 217 Neb. 796, 802, 352 N.W.2d 145 (1984), which give courts the discretion to permit a defendant to pursue a laches defense regardless of whether the plaintiff's action is characterized as legal or equitable.

[37] By way of background, we note the legislative genealogy of § 52-577d, which the defendant concedes, as a matter of statutory interpretation, revives the plaintiff's time-lapsed claims against it. Section 52-577d, was first enacted by the legislature in 1986. See Public Acts 1986, No. 86-401, § 6; see also Public Acts 1986, No. 86-403, § 104. That statute, as set forth in the 1987 revision of the General Statutes, provides: "Notwithstanding the provisions of section 52-577, no action to recover damages for personal injury to a minor, including emotional distress, caused by sexual abuse, sexual exploitation or sexual assault may be brought by such person later than two years from the date such person attains the age of majority, except that no such action may be brought more than seven years from the date of the act complained of." General Statutes (Rev. to 1987) § 52-557d.

In 1991, the legislature passed an amendment to § 52-577d that extended the two year limitations period to seventeen years and struck the seven year repose period. See Public Acts 1991, No. 91-240. In *Roberts* v. *Caton*, 224 Conn. 483, 492, 619 A.2d 844 (1993), this court held that the 1991 amendment applied retroactively, thus reviving otherwise time barred claims.

Subsequently, in 2002, the legislature amended § 52-577d to the seventeen year limitations period to thirty years. Public Acts 2002, No. 02-138, § 2. The legislature explicitly stated that the 2002 amendment was "[e]ffective from passage and applicable to any cause of action arising from an incident committed prior to, on or after said date . . . ." See Public Acts 2002, No. 02-138, § 2. For the text of the current revision of § 52-577d, see footnote 4 of this opinion.

[38] "Furthermore, we are mindful that state [c]onstitutional provisions must be interpreted within the context of the times. . . . We must interpret the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original meaning. . . . [A] constitution is, in [former United States Supreme Court] Chief Justice John Marshall's words, intended to endure for ages to come . . . and, consequently, to be adapted to the various crises of human affairs. . . . In short, the [state] constitution was not intended to be a static document incapable of coping with changing times. It was meant to be, and is, a living document with current effectiveness. . . . The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 156–57.

[39] As the defendant notes, in civil cases, this court has treated our state constitution's due process clauses coextensively; see *Giaimo* v. *New Haven*, 257 Conn. 481, 498, 778 A.2d 33 (2001); *Ramos* v. *Vernon*, supra, 254 Conn. 835 n.30; and has never determined that one is exclusively controlling in the civil context. We similarly need not do so here, although we agree with the defendant's observation that article first, § 10, of the Connecticut constitution contains language that is more specifically suited to the civil context. See W. Horton, The Connecticut State Constitution (2d Ed. 2012) p. 71 ("[l]ess violence will be done to the English language in context if the Supreme Court were to state explicitly that [article first, § 10, of the Connecticut constitution] generally applies in civil cases"); id., p. 78 (discussing civil due process cases under article first, § 10, of the Connecticut constitution because, "[i]n context, the due process clause in [article first, § 8, of the Connecticut constitution] seems to refer only to criminal cases").

[40] Our previous cases contemplate article first, § 10, of the Connecticut constitution as establishing the Judicial Branch's governmental obligation to provide expedient and fair justice in cases that have been brought to the courts for resolution. See, e.g., *Pellegrino* v. *O'Neill*, 193 Conn. 670, 684–85, 480 A.2d 476 (1984) (plurality opinion).

[41] This court's decision in *Gentile* v. *Altermatt*, 169 Conn. 267, 363 A.2d 1 (1975), which the defendant relies upon, does not dictate a contrary result. In *Gentile*, this court held that the 1818 adoption of article first, § 10, of the

Connecticut constitution "recognized all existing rights and removed from the power of the legislature the authority to abolish those rights in their entirety. Rather, the legislature retains the power to provide reasonable alternatives to the enforcement of such rights. Where such reasonable alternatives are created, the legislature may then restrict or abolish the incorporated common-law or statutory rights." Id., 286. The defendant contends that *Gentile* must be read to apply to defendants as well as plaintiffs, meaning that the "courts must also be open to defenses that existed in 1818 absent a reasonable alternative, and one of those defenses is the statute of limitations, as the historical prong [of *Geisler*] will show." See part IV B of this opinion. We agree with the plaintiff, however, that an assumption that *Gentile* applies to defenses as well as causes of action simply begs the question of whether the expanded statute of limitations for sexual abuse injuries in § 52-577d is a "reasonable alternative" to shorter statutes of limitations.

[42] Justice Bradley dissented in *Campbell*, concluding that, "when the statute of limitations gives a man a defense to an action, and that [defense] has absolutely accrued, he has a right which is protected by the [f]ourteenth [a]mendment of the [c]onstitution from legislative aggression." *Campbell* v. *Holt*, supra, 115 U.S. 630. Justice Bradley adopted a broader construction of the term property, observing that "an exemption from a demand, or an immunity from prosecution in a suit, is as valuable to the one party as the right to the demand or to prosecute the suit is to the other," and that "[m]y property is as much imperiled by an action against me for money, as it is by an action against me for my land or my goods. It may involve and sweep away all that I have in the world. Is not a right of [defense] to such an action of the greatest value to me?" Id., 630–31. Justice Bradley noted further that: "The immunity from suit which arises by operation of the statute of limitations is as valuable a right as the right to bring the suit itself. It is a right founded upon a wise and just policy. Statutes of limitation are not only calculated for the repose and peace of society, but to provide against the evils that arise from loss of evidence and the failing memory of witnesses." Id., 631. He concluded that "[r]emedies are the life of rights, and are equally protected by the [c]onstitution. Deprivation of a remedy is equivalent to a deprivation of the right which it is intended to vindicate, unless another remedy exists or is substituted for that which is taken away." Id.

[43] The United States Supreme Court may well, however, have left the door open for future due process challenges to specific revivals, insofar as it observed that the defendant had not "pointed out special hardships or oppressive effects which result from lifting the bar in this class of cases with retrospective force." *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 316. The court emphasized that the case was not one "where [the] appellant's conduct would have been different if the present rule had been known and the change foreseen." Id.; see also id. (noting that defendant "does not say, and could hardly say, that it sold unregistered stock depending on a statute of limitation for shelter from liability").

[44] When, however, the limitations period is part of the cause of action itself, and thus qualifies the plaintiff's right to avail himself of the action, "a retroactive extension of the period after its expiration amounted to a taking of property without due process of law." *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 312 n.8, discussing *William Danzer & Co.* v. *Gulf & S.I.R. Co.*, 268 U.S. 633, 636–37, 45 S. Ct. 612, 69 L. Ed. 1126 (1925). There is no claim that the present case falls into the category of those concerning a statutory cause of action with an integral time limitation, insofar as it concerns liability arising at common law.

[45] We note that the defendant contends that "*Roberts* itself relies on cases that support giving § 52-577d a substantive due process/vested rights content," citing specifically *Moore* v. *McNamara*, supra, 201 Conn. 16, *Andrulat* v. *Brook Hollow Associates*, supra, 176 Conn. 409, and *Diamond National Corp.* v. *Dwelle*, 164 Conn. 540, 325 A.2d 259 (1973). See *Roberts* v. *Caton*, supra, 224 Conn. 488–92. We disagree with the defendant's characterization of these cases.

As the defendant notes, *Roberts* cites *Andrulat* v. *Brook Hollow Associates*, supra, 176 Conn. 412–13, for the proposition that "changes in the statute of limitations may not retroactively bar actions already pending [but] they do govern actions brought subsequent to the effective date of the amended statute." (Internal quotation marks omitted.) *Roberts* v. *Caton*, supra, 224 Conn. 492. The defendant posits that this "must be because the plaintiff has a due process or vested right in bringing an action that cannot be cut off by a retroactively applied shorter statute of limitations," and "if a plaintiff has a right to bring a cause of action that is vested within the existing statute of limitations, a defendant should have a due process or vested right to defeat a cause of action once the plaintiff is outside the existing statute."

The fatal flaw in this argument is that *Andrulat* v. *Brook Hollow Associates*, supra, 412–13, does not state a constitutional due process basis for the cited proposition, but rather, relies on cases that are founded on the rule of presumed legislative intent embodied in General Statutes § 1-1 (u), which provides that "[t]he passage or repeal of an act shall not affect *any action then pending*." (Emphasis added.)

The defendant then notes that "*Roberts* cites *Diamond National Corp.* . . . for the proposition that a statutory cause of action that includes the limitations period is substantive rather than procedural, implying that the legislature could not revive such a cause once it has expired." See *Roberts* v. *Caton*, supra, 224 Conn. 489. We disagree, however, with the defendant's next point, which is that this "must be because the defendant would have a due process or vested right not to have the cause revived," particularly because article first, § 10, of the Connecticut constitution "treats statutory and common-law actions alike." The defendant's reliance on *Diamond National Corp.* for this broad proposition is misplaced, as it fails to take into account the long-standing distinction between substantive statutory rights and procedural remedies affecting common-law rights, which also is recognized for due process purposes as a matter of federal law. See authorities cited in footnote 44 of this opinion.

Finally, in *Moore*, this court held that the 1985 amendment to the limitations period on paternity actions, which expanded it from three years to eighteen years, applied retroactively against the defendant, relying on the unrebutted presumption that procedural statutes apply retroactively and that it did not "appear that retroactive application of the new statute of limitations would work an injustice on the defendant." *Moore* v. *McNamara*, supra, 201 Conn. 25. The defendant argues that, but for that fact that the action in *Moore* was already pending, "*Moore* might well have ruled that 'the new statute of limitations would work an injustice on the defendant,' which hardly preserves the public peace, health and morals." We view the defendant's argument regarding *Moore* as speculation, particularly given the fact that, in that case, this court upheld a statutory amendment with revival effect.

[46] As the amicus curiae notes, this court has shown deference to the legislature's judgment in rejecting a state constitutional challenge to the products liability statute of repose in General Statutes § 52-577a. *Daily* v. *New Britain Machine Co.*, 200 Conn. 562, 583–84, 512 A.2d 893 (1986). Despite the fact that the challenged ten year repose period might cut off claims before they even accrue, the court reasoned that the "purpose of the statute of repose contained in § 52-577a is . . . to provide an orderly, equitable process by which the products liability crisis could be eased without unreasonably depriving individuals of their right of redress," and deferred to the legislature's finding that the repose period might "bar the assertion of a just claim" and "causes hardship" is "outweighed by the advantage of outlawing stale claims." (Internal quotation marks omitted.) Id., 583.

[47] The court first considered resolving the case as a matter of statutory interpretation, but concluded that the presumption that statutes affecting substantive rights apply prospectively was inapplicable because the legislature had used "inconvertibly clear and definite" language of retroactivity. *Goshen* v. *Stonington*, supra, 4 Conn. 220.

We note that this principle of statutory construction has been codified in General Statutes § 55-3, which we "have uniformly interpreted . . . as a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only," while "procedural or remedial statutes are intended to apply retroactively absent a clear expression of legislative intent to the contrary . . . ." (Internal quotation marks omitted.) *Investment Associates* v. *Summit Associates, Inc.*, supra, 309 Conn. 867–68; see, e.g., *D'Eramo* v. *Smith*, 273 Conn. 610, 622–23, 872 A.2d 408 (2005); see also *D'Eramo* v. *Smith*, supra, 633 (*Zarella, J.*, concurring) (relying on *Goshen* and stating that, "in light of our continued reliance on the principle that no statute affecting substantive rights shall be construed to have a retrospective effect in the absence of an unequivocal expression of legislative intent to the contrary, it is impermissible to construe a statute's terms by seeking guidance from the legislative history").

[48] Our independent research and the parties' briefs do not disclose any on point case law from the courts of Alaska, Maryland, Nevada, Ohio, and Mississippi. See, e.g., *Catholic Bishop of North Alaska* v. *Does*, 141 P.3d 719, 725 (Alaska 2006) (interpretation of statute against retroactive application "makes it unnecessary for us to consider the . . . argument that retroactive application of this statute would violate any rights of repose that vested once the original statute of limitations had expired").

We note in particular our disagreement with both parties' reliance on *Pratte* v. *Stewart*, 125 Ohio St. 3d 473, 929 N.E.2d 415 (2010), as that case did not concern a defendant's challenge to a statute of limitations that had the effect of reviving a time-lapsed action. See id., 481 (rejecting plaintiff's challenge, under state constitution open courts provision, to change in statute of limitations that abrogated state supreme court decision imposing discovery tolling rule because plaintiff had no "vested right in the common-law discovery rule . . . and we would offend the separation-of-powers doctrine by invalidating the legislature's decision to impose a reasonable statute of limitations for claims of childhood sexual abuse").

Finally, although there is no decision squarely on point in Maryland, that state's existing case law appears to favor the defendant's position. Compare *Doe* v. *Roe*, 419 Md. 687, 703–707, 20 A.3d 787 (2011) (The court held that the statute extending the limitations period for tort claims arising from child sexual abuse is procedural or remedial, and may be applied retroactively to cases not yet time barred, but noted that "[w]e would be faced with a different situation entirely had [the defendant's] claim been barred under the three-year limitations period . . . . Because we are not presented with that scenario, we express no holding regarding the applicability of [the extended limitations statute] to child sexual abuse claims barred under the three-year statute as of . . . the effective date of the new statute."), with *Dua* v. *Comcast Cable*, 370 Md. 604, 633, 805 A.2d 1061 (2002) ("[t]his [c]ourt has consistently held that the Maryland [c]onstitution ordinarily precludes the [l]egislature [1] from retroactively abolishing an accrued cause of action, thereby depriving the plaintiff of a vested right, and [2] from retroactively creating a cause of action, or reviving a barred cause of action, thereby violating the vested right of the defendant"); but see *Allstate* Ins. Co. v. *Kim*, 376 Md. 276, 296–98, 829 A.2d 611 (2003) (legislature did not violate defendant's vested rights by retroactively abrogating defense of parent-child immunity).

[49] See *Schulte* v. *Wageman*, 465 N.W.2d 285, 287 (Iowa 1991); *Orman* v. *Van Arsdell*, 12 N.M. 344, 350, 78 P. 48 (1904); *Pnakovich* v. *SWCC*, 163 W. Va. 583, 589–91, 259 S.E.2d 127 (1979).

[50] The Georgia Supreme Court has followed *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, in concluding that "the legislature may revive a workers' compensation claim which would have been barred by a previous limitation period by enacting a new statute of limitation, without violating our constitutional prohibition against retroactive laws." *Canton Textile Mills*, *Inc.* v. *Lathem*, supra, 253 Ga. 105; see also *Vaughn* v. *Vulcan Materials Co.*, 266 Ga. 163, 164, 465 S.E.2d 661 (1996) ("[t]here is no vested right in a statute of limitation").

[51] We note the somewhat nuanced nature of the Kansas Supreme Court's decision in *Harding*, namely, that under the Kansas [c]onstitution, "[t]he legislature has the power to revive actions barred by a statute of limitations if it specifically expresses its intent to do so through retroactive application of a new law. The legislature cannot revive a cause of action barred by a statute of repose, as such action would constitute the taking of property without due process." (Emphasis omitted.) *Harding* v. *K.C. Wall Products*, *Inc.*, supra, 250 Kan. 669; see also id., 668 ("[W]e consider it important to explain the difference between the two theories. A statute of limitations extinguishes the right to prosecute an accrued cause of action after a period of time. It cuts off the remedy. It is remedial and procedural. A statute of repose limits the time during which a cause of action can arise and usually runs from an act of a defendant. It abolishes the cause of action after the passage of time even though the cause of action may not have yet accrued. It is substantive. Thus, Kansas constitutional protection applies only to statutes of repose because they pertain to substantive rights.").

[52] New Jersey's case law addressing this issue contains some inconsistency. Specifically, in *State by Parsons* v. *Standard Oil Co.*, 5 N.J. 281, 74 A.2d 565 (1950), aff'd, 341 U.S. 428, 71 S. Ct. 822, 95 L. Ed. 1078 (1951), the New Jersey Supreme Court rejected the federal approach embodied in *Campbell* v. *Holt*, supra, 115 U.S. 620, and *Chase Securities Corp.* v. *Donaldson*, supra, 325 U.S. 304, with respect to claims arising from contracts, stating that, "[u]nder our law, the right to interpose the bar of the statute of limitations to actions in contract of this class is a vested property right which the law-making body may not abrogate or impair. It is fundamental that the denial of the remedy affects the substance of the right in the constitutional sense. . . . When the remedy is taken away, the right ceases to exist." (Citation omitted.) The New Jersey Supreme Court subsequently declined "to accord this statement [in *Standard Oil Co.*] comprehensive

amplitude," holding that "it should be confined to the particular issue before the [c]ourt in that case, i.e., the effect of lapse of time upon a claim sounding in contract. The plaintiff's [workers' compensation] claim in the case before us does not spring from contract; it is a right born of statute." *Panzino* v. *Continental Can Co.*, supra, 71 N.J. 305.

Numerous New Jersey lower court decisions establish that *Panzino* limited *Standard Oil Co.* to contracts, insofar as they have rejected state and federal due process challenges to the legislative revival of a variety of lapsed tort actions. See, e.g., *Short* v. *Short*, 372 N.J. Super. 333, 338–39, 858 A.2d 571 (App. Div. 2004) (statutory wrongful death claims arising from certain homicide crimes that have resulted in criminal conviction), cert. denied, 182 N.J. 429, 866 A.2d 985 (2005); *D.J.L.* v. *Armour Pharmaceutical Co.*, 307 N.J. Super. 61, 84–85, 84 n.20, 704 A.2d 104 (Ch. Div. 1997) (claims against manufacturers of proprietary blood products by persons who contracted HIV or AIDS).

[53] See *Johnson* v. *Garlock, Inc.*, 682 So. 2d 25, 28 (Ala. 1996); *Jefferson County Dept. of Social Services* v. *D.A.G.*, 199 Colo. 315, 317–18, 607 P.2d 1004 (1980); *Doe* v. *Roman Catholic Diocese*, 862 S.W.2d 338, 341–42 (Mo. 1993); *Gould* v. *Concord Hospital*, 126 N.H. 405, 408, 493 A.2d 1193 (1985); *Wright* v. *Keiser*, 568 P.2d 1262, 1267 (Okla. 1977); *Ford Motor Co.* v. *Moulton*, 511 S.W.2d 690, 696–97 (Tenn.), cert. denied, 419 U.S. 870, 95 S. Ct. 129, 42 L. Ed. 2d 109 (1974); *Baker Hughes, Inc.* v. *Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999).

We observe, however, that notwithstanding *Ford Motor Co.* v. *Moulton*, supra, 511 S.W.2d 690, Tennessee state law appears unsettled on this point. Curiously, the United States Court of Appeals for the Sixth Circuit, noting a change in the membership of the Tennessee Supreme Court, and subsequent decisions quoting from the dissent in *Moulton*, declined to follow the state high court's decision in *Moulton*, concluding that the Sixth Circuit's "knowledge of the careful and progressive character of the Tennessee Supreme Court, make[s] it clear to us that the old vested rights doctrine as applied to statutes of limitations in *Moulton* is no longer the law in Tennessee and will be overruled when the occasion arises." *Murphree* v. *Raybestos-Manhattan, Inc.*, 696 F.2d 459, 462 (6th Cir. 1982). Subsequent Tennessee lower state court decisions have noted the Sixth Circuit's holding in *Murphree*, but continued to follow the vested rights approach dictated by the highest state court in *Moulton*. See, e.g., *Wyatt* v. *A-Best Products Co.*, 924 S.W.2d 98, 104 (Tenn. App. 1995) ("[W]e hold that the 1979 asbestos exception cannot be applied retroactively to revive [the defendant's already time barred] cause of action. This result is not pleasant, for it means that [the defendant's] claim was barred . . . before he could be rationally expected to have been aware that he suffered an injury."); see also id., 104 n.8 (expressly disagreeing with prediction in *Murphree*).

[54] See *Murray* v. *Luzenac Corp.*, 175 Vt. 529, 530–31, 830 A.2d 1 (2003); *Capron* v. *Romeyn*, 137 Vt. 553, 555–56, 409 A.2d 565 (1979).

[55] See *Green* v. *Karol*, 168 Ind. App. 467, 477, 344 N.E.2d 106 (1976); *Johnson* v. *Gans Furniture Industries, Inc.*, 114 S.W.3d 850, 854–55 (Ky. 2003); *Dobson* v. *Quinn Freight Lines, Inc.*, 415 A.2d 814, 816 (Me. 1980); *Nichols* v. *Wilbur*, 256 Or. 418, 419–20, 473 P.2d 1022 (1970); *Maycock* v. *Gravely Corp.*, 352 Pa. Super. 421, 427, 508 A.2d 330 (1986), appeal denied, 514 Pa. 618, 521 A.2d 932 (1987).

[56] The case law of our neighbor to the east on this issue bears special mention, given the parties' apparently divergent understanding of it. In *Twomey* v. *Carlton House of Providence, Inc.*, 113 R.I. 264, 270–71, 320 A.2d 98 (1974), the Rhode Island Supreme Court followed the federal approach and upheld the constitutionality of an expanded statute of limitations that applied retroactively to revive a time barred personal injury action. In so concluding, the court noted its preference for Justice Bradley's dissenting opinion in *Campbell* v. *Holt*, supra, 115 U.S. 620; see footnote 42 of this opinion; but deemed itself constrained to follow the majority's opinion in *Campbell* because the Rhode Island state constitution lacked a civil due process clause at the time. *Twomey* v. *Carlton House of Providence, Inc.*, supra, 271. Following the 1986 amendment of the state constitution to include a civil due process clause, the Rhode Island Supreme Court adopted Justice Bradley's approach as a matter of state constitutional law, to preclude "legislation with retroactive features permitting revival of an already time-barred action that would impinge upon a defendant's vested and substantive rights . . . ." *Kelly* v. *Marcantonio*, supra, 678 A.2d 883. Thus, we agree with the defendant that *Kelly* represents current Rhode Island law on this issue.

[57] We note that Virginia law presents an interesting treatment of this issue.

In *Starnes* v. *Cayouette*, supra, 244 Va. 202, the Virginia Supreme Court considered the constitutionality of a statute that extended the accrual time of a cause of action arising from injuries caused by sexual abuse, and also provided a limited revival period for otherwise time barred actions. Id., 204–205. The court held that this revival provision violated the due process clause of the Virginia state constitution, relying on centuries old decisions in the area of statutory construction restricting the legislature's power to "remove the bar [of the lapsed statute of limitations] by retrospective legislation." (Internal quotation marks omitted.) Id., 208. Citing Justice Bradley's dissent in *Campbell* v. *Holt*, supra, 115 U.S. 620; see footnote 42 of this opinion; the court held that there was "no constitutionally significant distinction between the two rights of defense," namely, a vested right to a common-law defense and a "statute imposing time limits on a right to bring action on a common law cause of action such as those she has pleaded," stating that "[b]oth are rights to a valuable property interest, and such rights are substantive in nature." *Starnes* v. *Cayouette*, supra, 211.

Thereafter, the Virginia constitution was amended to overrule *Starnes* specifically, with a provision that: " 'The General Assembly's power to define the accrual date for a civil action based on an intentional tort committed by a natural person against a person who, at the time of the intentional tort, was a minor shall include the power to provide for the retroactive application of a change in the accrual date. *No natural person shall have a constitutionally protected property right to bar a cause of action based on intentional torts as described herein on the ground that a change in the accrual date for the action has been applied retroactively or that a statute of limitations or statute of repose has expired.*' " (Emphasis added.) *Kopalchick* v. *Catholic Diocese of Richmond*, 274 Va. 332, 337, 645 S.E.2d 439 (2007), quoting Va. Const., art. IV, § 14; see also *Kopalchick* v. *Catholic Diocese of Richmond*, supra, 340 (concluding that diocese is not "natural person" subject to amendment, and "[w]ith respect to a defendant that is not a 'natural person,' the [preexisting] state of the law, as interpreted in *Starnes*, continues in effect").

[58] The New York Court of Appeals has stated that, unlike a final judgment, "the running of a [s]tatute of [l]imitations creates no . . . vested or property right. To the contrary, although it bars a remedy on the claim so long as it remains effective, it does not destroy the right or foreclose a change in the legislative policy which resulted in imposition of the bar." *Thomas* v. *Bethlehem Steel Corp.*, 63 N.Y.2d 150, 162, 470 N.E.2d 831, 481 N.Y.S.2d 33 (1984). Thus, New York's state and federal courts have applied the exceptional circumstances rule of *Gallewski* to uphold statutes reviving causes of action in a variety of cases wherein the plaintiff could not have brought an action in a timely manner. See *Hymowitz* v. *Eli Lilly & Co.*, 73 N.Y.2d 487, 514, 539 N.E.2d 1069, 541 N.Y.S.2d 941 (1989) (upholding legislature's adoption of discovery rule for " 'latent effects of exposure to any substance' " and simultaneous one year revival of lapsed actions because operation of "the exposure rule prevented the bringing of timely actions," and "an injustice has been rectified"); *Raquet* v. *J.M. Braun Builders, Inc.*, 273 App. Div. 2d 850, 709 N.Y.S.2d 292 (revival clause in statute abrogating common-law firefighters' rule), appeal dismissed, 95 N.Y.2d 902, 739 N.E.2d 1147, 716 N.Y.S.2d 642 (2000); *Matter of McCann* v. *Walsh Construction Co.*, 282 App. Div. 444, 450, 123 N.Y.S.2d 509 (1953) (upholding statute reviving time barred claims for workers' compensation arising from compressed air illness because it was "a disease of an insidious character, the effects of which might be latent or long delayed, the right to compensation might be barred by the operation of the [s]tatute of [l]imitations even before the claimant was aware of the fact that he had the disease"), aff'd, 306 N.Y. 904, 119 N.E.2d 596 (1954); see also *In re Agent Orange Products Liability Litigation*, 597 F. Supp. 740, 812 (E.D.N.Y. 1984) (servicepersons injured by Agent Orange); but see *In re World Trade Center Lower Manhattan Disaster Site Litigation*, United States District Court, Docket No. 07-CV-00060 (AKH) (S.D.N.Y. December 8, 2014) (invalidating "Jimmy Nolan's Law," which revived time barred claims arising from cleanup of ground zero following terrorist attacks of September 11, 2001, because injured workers had already enjoyed protection of New York's discovery rule, "which protected [them] against the unjust consequences imposed by the prior statute of limitations rule, which calculated the limitations period from the date of exposure," meaning that "there was no lingering injustice that Jimmy Nolan's Law had to correct").

[59] See also *Liebig* v. *Superior Court*, 209 Cal. App. 3d 828, 834–35, 257 Cal. Rptr. 574 (1989) (The court stated, in dicta, after declining to adopt the federal approach as a matter of California law, that "[e]ven if we were to assume arguendo that a vested right exists in repose of a cause of action,

the law is clear that vested rights are not immune from retroactive laws when an important state interest is at stake. . . . In this case the important state interest espoused by [the statute of limitations amendment reviving lapsed actions] is the increased availability of tort relief to plaintiffs who had been the victims of sexual abuse while a minor." [Citations omitted.]), review denied, California Supreme Court, Docket No. S006295 (June 22, 1989).

[60] Along these lines, the defendant posits that "[l]aw-abiding people and organizations need to know when they can safely dispose of mountains of records, and insurance companies need to know how long claims can be asserted when they are setting premiums. On the latter point, reviving an expired claim gives insurance companies no opportunity to recoup the expenses of such a claim through premiums. . . . In any event, all of us at some point need to know when we can and should move on." (Citation omitted.)

The defendant argues that these concerns are of particular significance in child sexual abuse cases, given the already lengthy statute of limitations and the fact that "the potential defense witnesses typically are much older. By 2008, [Ferguson] was dead, his supervising priest was dead, [Whealon] was dead, and the psychiatrist to whom [Whealon] sent [Ferguson] was dead. Medical records from 1979 through 1983 were routinely destroyed in 1996. Societal standards about dealing with sex offenders have certainly changed dramatically over the past [thirty] years. Much earlier disclosure of the misconduct surely would have served societal interests better."

[61] Thus, such commentators endorse revival statutes as part of the solution to this problem, and argue in support of their constitutionality, even under heightened scrutiny. See M. Hamilton, supra, 79 Brook. L. Rev. 404; see also E. Khorram, "Crossing the Limit Line: Sexual Abuse and Whether Retroactive Application of Civil Statutes of Limitation are Legal," 16 U.C. Davis J. Juv. L. & Policy 391, 425 (2012) (arguing that "immunity from civil suit is a vested property right, and a deprivation of such is a violation of the [f]ourteenth [a]mendment without a compelling state interest," but contending that "[p]rotecting children through granting legal access is a compelling state interest that should be trumpeted as such"); W. Gray, "A Proposal for Change in Statutes of Limitations in Childhood Sexual Abuse Cases," 43 Brandeis L.J. 493, 509 (2004–2005) (noting that "revival statutes . . . help in cases where the applicable statute of limitations has already passed," and urging states to "endeavor to permanently solve the problem of statutes of limitations in childhood sexual abuse cases by drafting forward-thinking legislation designed to confront the myriad facets of the childhood sexual abuse problem"); J. Miller, "The Constitutionality of and Need for Retroactive Civil Legislation Relating to Child Sexual Abuse," 17 Cardozo J.L. & Gender 599, 624 (2010–2011) ("state courts that interpret their state constitutions as protecting an individual's reliance on statutes of limitations should either alter this interpretation or consider amending their state constitution for the sake of child sexual abuse victims").

[62] The concurring opinion criticizes our analysis of the public policy *Geisler* factor as "internally inconsistent," contending that we "[purport] to undertake an independent review of the sociological and economic considerations at stake, in accordance with *Geisler*, but then [fail] to do so" by "defer[ring] to the legislature's primary responsibility in pronouncing the public policy of our state." (Internal quotation marks omitted.) The concurrence further states, that if "we were to defer to the legislature when considering the sociological and economic implications of a statute under *Geisler* . . . then that factor *always* would support the constitutionality of a statute." (Emphasis added.) We respectfully disagree with the concurrence's view of our approach to the public policy factor in *Geisler*. Beyond the deference inherent in the use of the reasonable doubt burden that a party seeking to strike a statute must carry; see, e.g., *Kerrigan* v. *Commissioner of Public Health*, supra, 289 Conn. 155; we defer in this case to the legislature's judgment because the parties have advanced competing reasonable policy concerns, and the legislative record reveals that the legislature made a considered decision that reflects those issues. Such deference would not be appropriate in deciding a state constitutional claim wherein the record lacks a similarly considered legislative judgment.

[63] In applying the rational basis standard, our "function . . . is to decide whether the purpose of the legislation is a legitimate one and whether the particular enactment is designed to accomplish that purpose in a fair and reasonable way. If an enactment meets this test, it satisfies the constitutional requirements of due process . . . . In determining whether the challenged

classification is rationally related to a legitimate public interest, we are mindful that [t]he test . . . is whether this court can conceive of a rational basis for sustaining the legislation; we need not have evidence that the legislature actually acted upon that basis. . . . Rational basis review is satisfied so long as there is a plausible policy reason for the classification . . . . [I]t is irrelevant whether the conceivable basis for the challenged distinction actually motivated the legislature. . . . To succeed, the party challenging the legislation must negative every conceivable basis which might support it . . . .” (Citations omitted; internal quotation marks omitted.) *Dutkiewicz* v. *Dutkiewicz*, 289 Conn. 362, 381–82, 957 A.2d 821 (2008).